## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Nicole A. Zelin
Pritzke & Davis, LLP
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samantha M. Sumcad
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Hayden Nix, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 18, 2020 <br><br> Court of Appeals Case No. <br> 19A-CR-1542 <br><br> Appeal from the Hancock Circuit Court <br><br> The Honorable R. Scott Sirk, Judge <br><br> Trial Court Cause No. <br> 30C01-1709-F5-1943 |

**Sharpnack, Senior Judge.**

# Statement of the Case

Hayden Nix appeals his conviction of domestic battery, a Class A misdemeanor;[1] and his sentence for domestic battery and battery resulting in moderate bodily injury, a Level 6 felony.[2] We affirm.

# Issues

Nix raises two issues, which we restate as:

    I.    Whether his sentence is inappropriate in light of the nature of the offenses and his character.

    II.    Whether his conviction of domestic battery should be vacated pursuant to the continuing crime doctrine.

# Facts and Procedural History

Nix, who was nineteen, had been dating M.W., who was fifteen, for two and a half months. On September 17, 2017, Nix picked up M.W. at her mother's house in Henry County, Indiana. They had planned to drive to the Indianapolis Zoo, where they would meet M.W.'s sisters. M.W.'s mother, Camille Potts, stayed home.

---

[1] Ind. Code § 35-42-2-1.3 (2016).

[2] Ind. Code § 35-42-2-1 (2016).

[4] Nix and M.W. stopped by his mother's home in Greenfield, Hancock County, Indiana, to get money. After Nix and M.W. left, and as they were driving toward Indianapolis, M.W. questioned him about something he had said, believing she had "caught him in a lie." Tr. Vol. II, p. 65. Nix became "very angry" and screamed at M.W. He also began hitting the steering wheel and the dashboard. The car swerved as he struck the steering wheel. M.W. was scared and screamed back at him.

[5] Nix drove into a parking lot behind a veterinarian's office and parked the car. He turned to M.W. and struck her in the face several times with a closed fist. M.W. exited the car. Nix "begged" her to get back in the car, telling her "there was [sic] people inside the building and they would come out and be suspicious of what was going on." *Id.* at 66.

[6] M.W. reentered the car, but she sat in the back seat. Nix became angry again, climbed into the back seat, and struck her in the face repeatedly. M.W. tried to get out of the car again, but Nix prevented her. He also yelled at her, calling her "[a] whore. A bitch. A slut." *Id.* at 67. M.W. told him "he was a horrible person." *Id.* at 68. Nix became even angrier and put a hand around her neck, strangling her. M.W. could not breathe, there was a ringing in her head, and her vision was "going black." *Id.* Nix accused M.W. of not loving him anymore. She responded that she did love him, that she "did still care about him and that there was still hope for us." *Id.* at 69. M.W. said "whatever [she] could say to calm him down." *Id.*

[7] At that point, Nix acted "like he woke up from a bad dream or something." *Id.* At first, he said he was going to turn himself in to the police, but then he told M.W. to get out of the car because "he was going to kill himself." *Id.* M.W. exited the car and called Nix's mother. Next, Nix drove though the parking lot, crashing the car "into a bush." *Id.*

[8] M.W. ran over to the car and opened the passenger's side door. Nix appeared to be "passed out," but when he heard M.W. talking to his mother, he "jumped out of the car" and ran to where M.W. was standing. *Id.* He grabbed M.W.'s phone, threw it to the ground, and hit her in the face again. This time, M.W. lost consciousness.

[9] When M.W. regained consciousness, she was in the front passenger seat of Nix's car, and he was "cleaning [her] off with ice cubes." *Id.* at 70. M.W. saw that she was "covered in blood." *Id.* She "couldn't move" or "see very well." *Id.* at 71. Nix told her to "calm down" as she briefly lost consciousness again. *Id.* Nix also took off her shirt and put a different one on her.

[10] Nix's car was still drivable, and they left the parking lot, heading back to Henry County. M.W. was nauseous and felt like she might pass out again. They stopped at a convenience store, where Nix purchased pain medicine. M.W. took several Advil, while Nix took "about fifteen Nyquil." *Id.* at 73. M.W. did not get out of the car at the convenience store, or when the car was stopped at stoplights and stop signs as they went back to Henry County, because she was scared of "what he would try to do." *Id.* at 159.

[11]     M.W. convinced Nix to take her to her older sister Sadie's house, telling him that Sadie and her family would still be at the zoo and she could clean up there. In truth, M.W. thought that her sisters might have returned home, because several hours had passed since Nix and M.W. had first stopped in the parking lot where Nix attacked her. She was still scared of Nix and promised she would lie to her family about what had happened.

[12]     When they arrived at Sadie's house, Sadie and her family had returned from the zoo. M.W. saw her other sister, Hannah, standing outside. M.W. approached Hannah, but Nix was right behind her.

[13]     Hannah noticed that M.W. was quiet and was hanging her head, which was unusual. When Hannah saw M.W. up close, she realized M.W.'s face was swollen, particularly her nose and an eye. It looked like M.W. "got in a fight with someone." *Id.* at 199. Hannah did not notice any injuries on Nix.

[14]     Hannah asked M.W. what happened, but M.W. stayed quiet while Nix told Hannah that M.W. had gotten into a fight with another girl at a gas station. M.W. agreed with Nix and then sat on a porch step. Hannah thought it was strange, because in her experience M.W. was not the kind of person to provoke a fight. Hannah asked what was on M.W.'s neck, and Nix told her it was "barbeque sauce." *Id.* at 75. Hannah looked inside Nix's car and saw a bloody shirt.

[15]     Hannah went inside to find Sadie. She told Sadie what Nix had said and further indicated she did not believe him. Sadie came outside, at which point

M.W. began to cry. Sadie noted that M.W. had blood on her shirt and in her hair, and marks on her neck. In addition, M.W.'s nose was crooked. Sadie did not notice any injuries on Nix. Sadie attempted to find out what happened, but every time she asked M.W. a question, "Hayden would answer." *Id.* at 185. Sadie sent M.W. inside. In passing, Hannah asked M.W., "did he do this to you," *Id.* at 202, and M.W. nodded her head.

[16] Next, Sadie asked Nix what had happened to M.W., and he again claimed someone had beaten M.W. at a gas station. Sadie "did not believe a word he was saying." *Id.* at 178. She told Nix he could leave, but M.W. was staying with her. Next, Sadie went inside and spoke with M.W. M.W. nodded her head when Sadie asked whether Nix had hit her.

[17] While M.W. spoke with Sadie, Nix returned to his car. He texted M.W. pictures of himself throwing up in his car, claiming he was "overdosing." *Id.* at 76. At M.W.'s request, Hannah went to Nix's car to check on him. Nix was talking with his mother on the telephone, and Hannah heard him tell his mother that he had "punched [M.W.] in the face." *Id.* at 205.

[18] Nix's grandparents arrived at Sadie's house. Nix's grandfather did not see any signs of injury on him. After examining the damage to Nix's car, he told Nix to go home.

[19] Meanwhile, Sadie had called Potts, who drove to Sadie's house. When she arrived, she saw Nix driving away, while M.W. was standing outside with Sadie. Potts approached M.W., who was crying. M.W. had a black eye, a

crooked nose, bruises on her neck, a large bruise on her arm, and a swollen lip. Potts observed that M.W. was "just kind of foggy, kind of out of it." *Id.* at 41. M.W. told Potts that "her eye and her head" hurt, *id.* at 49, and she had a bad headache.

[20] Potts called the police, and Deputy Blake Thrasher of the Henry County Sheriff's Department arrived at Sadie's house. Deputy Thrasher interviewed M.W. and took pictures of a large bruise on her left arm, a bruise on her neck, a swollen bruise on the left side of her face just below the eye, and her crooked nose. The deputy also took pictures of M.W.'s swollen lip and marks on the back of her neck. Next, Deputy Thrasher called Nix's grandmother. She refused to tell him Nix's location.

[21] Deputy Thrasher prepared a report. Because the attack occurred in Hancock County, he called the Hancock County Sheriff's Department to ask that agency to follow up on the matter.

[22] Later that day, Potts took M.W. to a hospital. M.W. told emergency room personnel that her boyfriend had attacked her while she was sitting in his vehicle. She further stated that he had hit her in the head, shoulder, abdomen, and chest with his fist, and he had also choked her and hit her left ear. Among other symptoms, she reported nausea, dizziness, and a headache. Hospital staff performed a CAT scan on her head and abdomen. A doctor diagnosed M.W. with a "left maxillary sinus and nasal bone fracture." Tr. Vol. IV, State's Ex. 30, p. 68.

[23] The next day, Detective Doug Cook of the Hancock County Sheriff's Department contacted Potts. Potts and M.W. went to the sheriff's office, where Detective Cook spoke with M.W. alone for about an hour. He observed that she was "very scared" and "very emotional." Tr. Vol. III, p. 11. In addition, Detective Cook took more pictures of M.W. By that time, she had developed a large bruise below her left eye and a bruise on the inside right corner of her mouth.

[24] After Potts and M.W. left the sheriff's department, they drove along the highway on which Nix and M.W. had traveled the previous day. M.W. recognized the parking lot where Nix had attacked her. Potts and M.W. found her sunglasses and part of her phone case on the ground, near the bush that Nix had hit with his car. Potts and Nix did not move either item. Potts called the police. Officers arrived and collected the phone case and sunglasses.

[25] M.W. later told a probation officer who was investigating Nix that she felt "terrified" during and after Nix's attack. Appellant's App. Vol. II, p. 75. She further stated she had "struggled emotionally and physically" after the attack and felt anxiety to the point that she stopped eating regularly, losing "an unhealthy amount of weight." *Id.* M.W. reported ongoing nightmares resulting from Nix's acts, and she was considering counseling.

[26] On September 20, 2017, the State charged Nix with two counts of battery resulting in serious bodily injury, both Level 5 felonies; criminal confinement, a

Level 5 felony; strangulation, a Level 6 felony; battery resulting in moderate bodily injury, a Level 6 felony; and domestic battery, a Class A misdemeanor.

[27] The trial court presided over a jury trial on May 21-23, 2019. The jury determined Nix was guilty of battery resulting in moderate bodily injury and domestic battery, and not guilty of the other charges.

[28] On June 27, 2019, the trial court held a sentencing hearing. For the conviction of battery resulting in bodily injury, the court imposed a sentence of 910 days, to be served in the county jail. For the conviction of domestic battery, the court imposed a sentence of 365 days, also to be served in the county jail. The court ordered Nix to serve the sentences consecutively to one another, for a total sentence of three and a half years. Finally, the court ordered Nix to serve the total sentence in this case consecutively to a sentence in another case. This appeal followed.

# Discussion and Decision

## I. Appropriateness of Sentence

[29] Nix claims his sentence is too high and asks the court to reduce each sentence and order that he serve them concurrently rather than consecutively.

[30] Indiana Constitution article seven, section six authorizes the Court to review and revise sentences "for defendants in all criminal cases." This authority is implemented through Indiana Appellate Rule 7(B), which provides: "[t]he Court may revise a sentence authorized by statute if, after due consideration of

the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[31] We recognize the special expertise of the trial courts in making sentencing decisions; thus, we exercise with great restraint our responsibility to review and revise sentences. *Scott v. State*, 840 N.E.2d 376, 381 (Ind. Ct. App. 2006), *trans. denied*. The principal role of 7(B) review is to leaven the outliers, rather than to achieve a perceived "correct" sentence. *McCallister v. State*, 91 N.E.3d 554, 566 (Ind. 2018). We impose on the defendant the burden of persuading us that a revised sentence is warranted. *Id.* When conducting this inquiry, we may look to any factors appearing in the record. *Rich v. State*, 890 N.E.2d 44, 54 (Ind. Ct. App. 2008), *trans. denied*.

[32] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Connor v. State*, 58 N.E.3d 215, 220 (Ind. Ct. App. 2016). At the time Nix committed the offenses at issue, the maximum sentence for a Level 6 felony was two and one-half years, the minimum sentence was six months, and the advisory sentence was one year. Ind. Code § 35-50-2-7 (2016). In addition, a person who was found guilty of a Class A misdemeanor could be imprisoned for a fixed term "of not more than one year." Ind. Code § 35-50-3-2 (1977). The trial court imposed the maximum sentence for each conviction, to be served consecutively for a total sentence of three and a half years.

[33] Turning to the nature of the offenses, Nix argues the circumstances "are not 'egregious' and certainly do not consist of anything more than the 'typical' offense." Appellant's Br. p. 9. We disagree. Nix struck M.W. in three distinct phases: (1) as she sat in the front seat of his car; (2) as she sat in the back seat of his car; and (3) as she was standing outside the car, talking to his mother on her phone. He had ample opportunity to stop his criminal conduct, but he continued to strike M.W. until he rendered her unconscious.

[34] Nix inflicted a variety of injuries on M.W., ranging from fractured facial bones to severe bruises and a headache. In addition, he inflicted mental trauma upon her. M.W. later reported feeling "terrified" during and after Nix's attack. Appellant's App. Vol. II, p. 75. She further stated she had "struggled emotionally and physically" to the point that she stopped eating regularly, losing "an unhealthy amount of weight." *Id.*

[35] Another negative aspect of the circumstances of the offenses is Nix's failure to seek medical help for M.W. after beating her. He instead took her to her sister's house, under the belief that she would clean up and conceal the blood and her injuries. In addition, he lied to M.W.'s sisters about what he had done, and M.W. felt intimidated into supporting his lies at first. Nothing about the nature of the offenses renders his enhanced, consecutive sentences inappropriate.

[36] We next turn to the character of the offender. Nix, who was twenty years old at sentencing, notes that he had no adult criminal convictions when he committed the offenses at issue here, but that is not the end of the story.

[37]     As a juvenile, Nix was the subject of numerous delinquency cases. He was adjudicated a delinquent for acts that, if committed by an adult, would have constituted child molesting, a Level 3 felony; two counts of sexual battery, both Class D felonies; two counts of conversion, both Class A misdemeanors; and two counts of battery as Class B misdemeanors. It is significant that Nix has continued to commit violent crimes despite opportunities to reform. In addition, in several of those cases the juvenile courts placed him on probation, and he violated the terms of his probation.

[38]     Next, after the current case began, the State filed another criminal case against Nix in Hancock County, charging him with several sexual offenses. Prior to sentencing in this case, Nix pleaded guilty to three counts of sexual misconduct with a minor, all Level 5 felonies.

[39]     In addition to this relatively lengthy history of formally adjudicated, serious misconduct, Nix admitted during trial in this case that he had sex with fifteen-year-old M.W., which is a Level 5 felony. *See* Ind. Code § 35-42-4-9 (2014) (sexual misconduct with a minor). Further, he has admitted that he drank alcohol and smoked marijuana frequently, beginning around age seventeen.

[40]     In summary, Nix has failed to persuade us that his maximum, consecutive sentences are inappropriate in light of the nature of the offenses and his character. *See Grundy v. State*, 38 N.E.3d 675, 683-84 (Ind. Ct. App. 2015) (sentence for battery not inappropriate; Grundy attacked a "defenseless" victim

without provocation and had a lengthy criminal history, including prior convictions of battery), *trans. denied*.

## II. Continuing Crime Doctrine

[41] Nix argues that his offenses of domestic battery and battery with moderate bodily injury were essentially "a single transaction," Appellant's Br. p. 11, and concludes his conviction for domestic battery should be vacated under the continuing crime doctrine.

[42] The continuing crime doctrine, also known as the continuous crime doctrine, "is a rule of statutory construction and common law limited to situations where a defendant has been charged multiple times with the same offense." *Hines v. State*, 30 N.E.3d 1216, 1219 (Ind. 2015). "'The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime.'" *Id.* (quoting *Boyd v. State,* 766 N.E.2d 396, 400 (Ind. Ct. App. 2002)). "The focus . . . should be on the specific actions alleged." *Heckard v. State*, 118 N.E.3d 823, 832 (Ind. Ct. App. 2019), *trans. denied*. Whether the continuing crime doctrine applies to a case is a question of law, which we review de novo. *Hines*, 30 N.E.3d at 1219.

[43] The State alleged Nix committed domestic battery by slapping her on the face. The State further alleged Nix committed battery resulting in moderate bodily injury by bruising her arm. At trial, the State demonstrated that Nix committed these distinct offenses against Nix in two separate stages: he first struck her in

the face while she sat in the front seat of her car, and then he struck her again, and held her down, after she returned to the car but sat in the back seat. Under these circumstances, Nix's conviction for domestic battery did not violate the continuing crime doctrine. *See Firestone v. State*, 838 N.E.2d 468, 472 (Ind. Ct. App. 2005) (convictions for rape and criminal deviate conduct did not violate continuing crime doctrine; Firestone committed different acts at different times); *cf. Gomez v. State*, 56 N.E.3d 697, 704 (Ind. Ct. App. 2016) (three convictions for domestic battery violated continuing crime doctrine; Gomez was charged with grabbing victim, pulling her hair, and pushing her against the wall, but those acts occurred during one short, uninterrupted attack).

# Conclusion

[44] For the reasons stated above, we affirm the judgment of the trial court.

[45] Affirmed.

May, J., and Altice, J., concur.