

FILED

Jul 08 2016, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ann M. Sutton
Marion County Public Defender
Agency Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ariel Gomez,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

July 8, 2016

Court of Appeals Case No.
49A02-1511-CR-2000

Appeal from the Marion Superior
Court

The Honorable Hugh Patrick
Murphy, Magistrate

Trial Court Cause No.
49G16-1506-CM-21813

**Brown, Judge.**

Ariel Gomez appeals his three convictions for domestic battery as class A misdemeanors. Gomez raises two issues which we revise and restate as:

> I. Whether the evidence is sufficient to support his convictions; and
>
> II. Whether his convictions violate the continuous crime doctrine.

We affirm in part and reverse in part.

## Facts and Procedural History

Gomez and Maria Chavez were married in 1995, and Gomez filed a petition for dissolution of marriage on October 28, 2014. Chavez and Gomez owned property on Rochester Avenue in Indianapolis (the "Rochester Property").[1] On December 16, 2014, the dissolution court entered a preliminary order which ordered that Gomez would have temporary possession of "rental property rents."[2] Exhibits at 12.

On May 16, 2015, the dissolution court held a final dissolution hearing at which Gomez appeared in person and by counsel, Chavez appeared *pro se*, and a Spanish interpreter appeared. Chavez believed that the Rochester Property had been "granted to [her] legally by the Judge," and it was her "understanding

---

[1] The parties also owned parcels on Alton Avenue and King Avenue.

[2] The preliminary order did not specifically identify the rental properties by address or otherwise.

from the Judge that [she] had possession" of the property. Transcript at 8.[3] According to Chavez, on June 21, 2015, she learned that Gomez had "lied to the Judge saying the [Rochester Property] was rented when it wasn't rented," that Gomez "had it ready to be rented after the Judge had granted it to [her]," and that she "found out that he was going to get in the house, the person who was going to rent the house, and [she] had to wait until the contract expired to be able to take over the house." *Id.* at 10. That day, Chavez called one of her friends to see if her son, Amilcar Melendez, could help her "change the locks of the house so he wouldn't have access to it." *Id.*

[4] Chavez and Melendez were at the Rochester Property when a woman and her boyfriend arrived in a truck. Chavez "told the renter that if he had received any deposit to ask for that because the house was not for rent because [Chavez] was

---

[3] The record does not contain a transcript of the May 16, 2015 hearing in the dissolution action. Subsequently, on June 24, 2015, the dissolution court entered a Decree of Dissolution of Marriage. Under a heading for asset and debt division, the decree found that the Rochester Property and the properties on Alton Avenue and King Avenue were jointly titled and had no mortgages or liens and stated, "[d]uring the pendency of this matter, [Gomez] has been renting out the King Property for $400 a month, and he has been renting out the Rochester Property for $450 a month" and "[t]he Court finds that [Gomez] collected $6,800 in rental proceeds during the pendency of this matter." Exhibits at 16. The decree awarded the Rochester Property to Chavez, and it awarded the $6,800 of rental proceeds and the properties on Alton Avenue and King Avenue to Gomez. The court ordered that Gomez "shall sign a quitclaim deed transferring his interest in the Rochester Property" to Chavez, ordered that Chavez "shall have immediate possession of the Rochester Property, subject to the current lease," and ordered that Gomez "shall provide [Chavez] with a copy of the current lease for the Rochester Property, and [Chavez] shall be entitled to the rental proceeds for the Rochester Property until the expiration of the lease." Exhibits at 17.

going to live there."[4]  *Id.* at 11.  The woman stayed in the vehicle and called Gomez.  Chavez gave Melendez her keys and told him to take her car "and go around and then come back and pick [her] up" because she did not want Melendez to be found by Gomez.  *Id.* at 30.  The woman in the truck observed Melendez leave the property immediately after she called Gomez.  Also, before Gomez arrived at the property, the woman heard Chavez screaming and crying inside the house.

[5]  About ten minutes after the woman in the truck called Gomez, he arrived at the property.  He was upset, banged on the front door, entered the house,[5] and Chavez called the police.  Gomez "grabbed [Chavez] by the hair [and] tried to get [her] out of the house," and she "couldn't and [she] didn't want to get out of the house."  *Id.* at 12.  He pushed her against the wall of the kitchen strongly several times, and she sustained scratches to her left arm, a cut to her elbow, and a bruise to her right knee.

[6]  Approximately fifteen minutes after he had left, Melendez returned to the Rochester Property and "could hear [Gomez and Chavez] screaming and

[4] The woman in the van had paid Gomez a deposit of $500 and entered into a residential lease with him. The lease agreement provided that the term of the tenancy was from June 20, 2015, until June 20, 2016, and that rent would be paid to Gomez.  A receipt for the $500 deposit is dated June 21, 2015.

[5] The woman in the truck testified that Gomez knocked or banged on the front door, that she saw the door open and Gomez enter the house through the door, that she observed that Chavez's demeanor was very aggressive, and that she heard Gomez and Chavez speak to each other.  Chavez testified that she locked the door, that Gomez hit and kicked the door, and that he went around to a patio and broke a window and entered through the window.

knocking on the walls" and Chavez crying, and Melendez called the police. *Id.* at 31. Gomez exited the house and said he did not want to see Melendez in his home, and Melendez said okay. The woman in the truck lost sight of Gomez for at most three minutes.[6] At some point, Chavez tried to shut the door and Gomez placed his foot on the door to keep it open. The police arrived about three minutes after Gomez opened the door, and they walked up to the residence, found the door open, and observed both Gomez and Chavez right by the front door. Chavez was crying, disheveled, and distraught while Gomez was calm.

[7] On June 22, 2015, the State charged Gomez with four counts of domestic battery as class A misdemeanors and four counts of battery resulting in bodily injury as class A misdemeanors. The court held a bench trial at which Chavez testified that she was not represented by an attorney in her divorce proceeding, that she did not know English, and that she had not read the December 16, 2014 preliminary order. The court found Gomez guilty of three counts of domestic battery as class A misdemeanors, Counts II, III, and IV,[7] and found

---

[6] When asked "did you lose sight of [] Gomez," the woman in the truck answered "[f]or a little while because [Chavez] closed the door," and when asked "you said a little while. How long was the door shut before it opened again," the woman testified "[i]t was like three – could be minutes, seconds. It wasn't a long time." Transcript at 52-53. When later asked, "after [Gomez] went inside, the door shut for maybe three seconds to three minutes," the renter responded affirmatively. *Id.* at 53.

[7] The State alleged in Count II:

> On or about June 21, 2015, Ariel Gomez did knowingly touch [Chavez], who is or was the spouse of Ariel Gomez, . . . in a rude, insolent, or angry manner, to wit: grabbed, and

him not guilty of the remaining charges, and sentenced him to 365 days with 359 days suspended to probation on each count to be served concurrently.

## *Discussion*

### I.

The first issue is whether the evidence is sufficient to support Gomez's convictions. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*,

---

further said touching resulting in bodily injury to the other person, specifically scratch mark(s)[.]

Appellant's Appendix at 19. In Count III, the State alleged:

On or about June 21, 2015, Ariel Gomez did knowingly touch [Chavez], who is or was the spouse of Ariel Gomez, . . . in a rude, insolent, or angry manner, to wit: slammed [Chavez] into a wall, and further said touching resulting in bodily injury to the other person, specifically cut(s)[.]

*Id.* In Count IV, the State alleged:

On or about June 21, 2015, Ariel Gomez did knowingly touch [Chavez], who is or was the spouse of Ariel Gomez, . . . in a rude, insolent, or angry manner, to wit: pulled [Chavez's] hair, and further said touching resulting in bodily injury to the other person, specifically pain[.]

*Id.*

726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

[9] Ind. Code § 35-42-2-1.3(a) provides that "[a] person who knowingly or intentionally touches an individual who: (1) is or was a spouse of the other person . . . in a rude, insolent, or angry manner that results in bodily injury to the person described in subdivision (1) . . . commits domestic battery, a Class A misdemeanor."

[10] Gomez asserts that the State did not negate his claim of defense of property and therefore his convictions must be reversed. He argues that he had been given the right to the property in the preliminary order from the divorce court, that the court did not award the Rochester Property to Chavez until days after the incident, that Chavez went to the property to keep a renter out and to change the locks and hid the man who was changing the locks by telling him to go around the block, that the entire episode lasted under three minutes and Chavez claims she received the scratches and bruises while Gomez was trying to push her out of the home, and that "[p]ushing [Chavez] out when she refused to leave was a legally acceptable option." Appellant's Brief at 12. He also asserts that "[w]hile it may be preferred that the authorities are called in such a situation, the same argument can be extended to taking the steps to change the locks on a property the person has no right to possess," that "[r]emoving

[Chavez] so the renters could enter was a reasonable option when she refused to leave," and "[t]hat [Chavez's] injuries were minor demonstrates that the force exerted by [him] in trying to extract [her] from his property was reasonable in light of the urgency of the situation." *Id.* at 12.

The State maintains that there was no clear evidence that Chavez was a trespasser or that Gomez's actions were reasonable. It argues that the Rochester Property was still, at least in part, in Chavez's name, that Chavez understood that she was in possession of the house, which was formally decreed three days later, and that the preliminary order did not necessarily mean that Gomez was granted exclusive possession of the property but only that he could possess the rents from the property. The State also argues that Gomez's actions were not reasonable because he had several options beyond physically attacking Chavez and that Chavez's injuries demonstrate that Gomez attempted to use far more force than was reasonably necessary under the circumstances.

A claim of defense of property is analogous to the defense of self-defense. *Hanic v. State*, 406 N.E.2d 335, 339 (Ind. Ct. App. 1980). Ind. Code § 35-41-3-2 provides in part:

> (d)  A person:
>
>     (1)   is justified in using reasonable force, including deadly force, against any other person; and
>
>     (2)   does not have a duty to retreat;

> if the person reasonably believes that the force is necessary to prevent or terminate the other person's unlawful entry of or attack on the person's dwelling, curtilage, or occupied motor vehicle.
>
> (e)     With respect to property other than a dwelling, curtilage, or an occupied motor vehicle, a person is justified in using reasonable force against any other person if the person reasonably believes that the force is necessary to immediately prevent or terminate the other person's trespass on or criminal interference with property lawfully in the person's possession, lawfully in possession of a member of the person's immediate family, or belonging to a person whose property the person has authority to protect. . . .

[13]    The State must disprove at least one element of the defense beyond a reasonable doubt. *Nantz v. State*, 740 N.E.2d 1276, 1280 (Ind. Ct. App. 2001), *trans. denied*. It is the factfinder's decision to determine whether a claim of self-defense has been disproved. *Id.* Consequently, to establish his defense of property defense, Gomez was required to prove that he used reasonable force to prevent or terminate a trespass or to defend his property or property he was authorized to protect. *See id.* Any force employed must be reasonable in light of "the urgency of the situation." *Cf. Mateo v. State*, 981 N.E.2d 59, 72 (Ind. Ct. App. 2012), *trans. denied*.

[14]    The record reveals that the preliminary order granted Gomez temporary possession of rental property rents, that the Rochester Property was jointly titled, and that Chavez testified that her understanding after the final dissolution

hearing was that the dissolution court had granted her possession of the Rochester Property. She testified that, when she learned that a tenant was moving to the Rochester Property and that she would have "to wait until the contract expired to be able to take over the house,"[8] Transcript at 10, she went with Melendez to change the locks. When Gomez became aware of this, he entered the Rochester Property, grabbed Chavez by the hair, pushed her, and pushed her against the kitchen wall, resulting in scratch marks on Chavez's arm and a cut on her elbow. The evidence supports the conclusion that the force used by Gomez was unreasonable in light of the urgency of the situation and unreasonable to protect any alleged interest he may have had in the rents from the Rochester Property.[9]

[15] Based upon the record, we conclude that the trial court as the trier of fact could find beyond a reasonable doubt that the State disproved an element of Gomez's defense of property claim and that he committed the offenses of domestic battery as class A misdemeanors. *See Nantz*, 740 N.E.2d at 1281 (concluding

---

[8] Although the record does not contain a transcript of the May 16, 2015 dissolution hearing, the court's June 24, 2015 dissolution decree awarded Chavez "immediate possession of the Rochester Property, subject to the current lease." Exhibits at 17. Meanwhile, Gomez entered into a residential lease with a tenant for a year-long term which began on June 20, 2015, and expired on June 20, 2016.

[9] The term of the residential lease began on June 20, 2015, and the decree ordering that Chavez shall be entitled to the rental proceeds for the Rochester Property was issued on June 24, 2015, and thus Gomez had an interest, at most, in four days' worth of rental income from the Rochester Property.

that the defendant's conduct of pointing a firearm constituted unreasonable force to protect his alleged property interest in a bulldozer).

## II.

The next issue is whether Gomez's three convictions for domestic battery as class A misdemeanors violate the continuous crime doctrine. Gomez argues that he and Chavez "were engaged in a three minute tussle as Gomez sought to terminate her illegal entry into his property," that "[e]ach step did not constitute a separate act of battery, but was a whole act of pulling her hair and engaging in an effort to remove her from the house, knocking into walls as they headed for the door," and that, "[i]f [he] committed domestic battery as charged, it was one instance of battery, and the injuries were the product of the one continuous act." Appellant's Brief at 15. He further argues that Chavez "answered positively when asked whether he was continuing to try to get her out of the house while she was resisting getting pushed out of the house." *Id.* He also contends that he "should not have been charged for every scrape and bruise resulting from their tussle" and that two of his convictions should be vacated. *Id.*

The State asserts that it is not clear that Gomez's actions were so connected as to constitute a single uninterrupted transaction. It argues that, "while Gomez attempted to shove Chavez out of the house, which resulted in her arms being scratched" there "seemed to be other actions that were more malicious than

connected to the purpose of forcing her out of the home," namely, "[f]irst, Gomez pulled Chavez's hair" and "[l]ater, he repeatedly banged her against the wall, which cut her arm."  Appellee's Brief at 18.

[18] The continuous crime doctrine defines those instances where a defendant's conduct amounts only to a single chargeable crime and prevents the State from charging a defendant twice for the same continuous offense.  *Koch v. State*, 952 N.E.2d 359, 373 (Ind. Ct. App. 2011), *trans. denied*.  The doctrine "essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction."  *Id.* (citation omitted).  The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime.  *Hines v. State*, 30 N.E.3d 1216, 1219 (Ind. 2015) (citing *Pierce v. State,* 761 N.E.2d 826, 830 (Ind. 2002) (recognizing "a series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*")).[10]  The continuous crime doctrine requires a fact-sensitive

---

[10] In *Richardson v. State,* the Indiana Supreme Court examined the double jeopardy clause of the Indiana Constitution and explained in part that "two or more offenses are the 'same offense' . . . if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Hines*, 30 N.E.3d at 1221 (citing *Richardson*, 717 N.E.2d 32, 49 (Ind. 1999)).

analysis. *Chavez v. State*, 988 N.E.2d 1226, 1229 (Ind. Ct. App. 2013), *trans. denied*. We turn to whether Gomez's actions of grabbing Chavez, slamming her into a wall, and pulling her hair, which are actions sufficient in themselves to constitute separate criminal offenses, on the evidence of this case as presented by the State at trial, are "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *See Koch*, 952 N.E.2d at 373.

[19]     The evidence shows that the woman in the truck called Gomez on the phone and he arrived at the Rochester Property about ten minutes later. With respect to her altercation with Gomez, Chavez testified as follows:

>   A      (Interpreter:) . . . . When he got in, he grabbed me by the hair, he tried to get me out of the house. I couldn't and I didn't want to get out of the house.
>
>   Q      And how was he trying to get you out of the house?
>
>   A      (Interpreter:) From my hair, pushing me.
>
>   Q      So he's trying to get you out of the house and were you resisting getting pushed out of the house?
>
>   A      (Interpreter:) Yes.
>
>   Q      And then what happens after that?
>
>   A      (Interpreter:) He insulted me verbally. He told me that I was going out with the son of my friend, that I was a prostitute, and that I needed to get out of the house.

Q   And so during this time was he still trying to push you out of the home?

A   (Interpreter:) Yes. Several times he pushed me against the wall of the kitchen strongly.

Q   And did this result in any type of injury on you at the time?

A   (Interpreter:) The hair and then some bruises and scratches.

Q   So he hit you against the wall a couple of times --

A   (Interpreter:) Yes.

Q   -- and then what happened after that?

A   (Interpreter:) The police arrived. He let me go and went out through the door.

Transcript at 12-13. The woman in the truck testified that she lost sight of Gomez inside the house for a period of at most three minutes, which is consistent with the testimony that Melendez left the property immediately after the woman in the truck called Gomez, that Gomez arrived at the property about ten minutes after the woman called him, and that Melendez returned to the property about fifteen minutes after he had left, or about five minutes after Gomez arrived at the property. The deputy prosecutor argued in closing that Gomez "forcibly tries to take her out by her hair. When she resists – because in her mind this was her rightful home – he then slams her into the wall two to three times, if not more, before he finally stops when the police arrive" and that

"[t]hree minutes is plenty of time for someone to bang another person around against a wall and cause the injuries that Ms. Chavez had." *Id.* at 60-61.

[20] Based upon the record and considering Chavez's testimony describing Gomez's acts while trying to push her out of the house, we conclude that the acts alleged in Counts II, III, and IV were sufficiently compressed in terms of time, place, singleness of purpose, and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine. *See Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012) (noting that the defendant's convictions for insurance fraud stemmed from six false statements given in a single insurance investigation interview, that her three convictions for obstruction of justice stemmed from a single crime scene clean-up in which she removed an alcohol bottle, medication container, and foam from the victim's mouth, and that the defendant's conduct was continuous so as to constitute one offense of insurance fraud and one offense of obstruction of justice), *trans. denied*; *see also Chavez*, 988 N.E.2d at 1229 (holding that the defendant committed two chargeable acts of child molesting rather than five and noting that three of the acts occurred during a first encounter between the defendant and the victim and two of the acts occurred during a second encounter). *Cf. Hines*, 30 N.E.3d at 1220-1221 (holding the continuous crime doctrine did not apply to the facts of the case and noting the defendant was not convicted of

multiple charges of charges of battery).  Accordingly, we reverse Gomez's convictions on Counts III and IV.[11]

### *Conclusion*

[21] For the foregoing reasons, we affirm Gomez's conviction for domestic battery as a class A misdemeanor on Count II and reverse his convictions on Counts III and IV.

[22] Affirmed in part and reversed in part.

Baker, J., and May, J., concur.

---

[11] Gomez also argues his multiple convictions violate double jeopardy.  Because we reverse Counts III and IV based on the continuous crime doctrine, we need not address Gomez's double jeopardy arguments. Gomez's aggregate sentence will not be affected by the reversal of his convictions on Counts III and IV as the trial court ordered concurrent sentences.