FILED

Oct 29 2020, 9:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Quantavious Jones,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

October 29, 2020

Court of Appeals Case No.
20A-CR-202

Appeal from the Marion Superior
Court

The Honorable Shatrese M.
Flowers, Judge

Trial Court Cause No.
49G02-1810-F2-37556

**Weissmann, Judge.**

[1] Quantavious Jones appeals his convictions for two counts of Level 3 Felony Aggravated Battery Causing Serious Permanent Disfigurement, one count of Level 5 Felony Kidnapping With Bodily Injury, one count of Level 2 Felony Kidnapping For Ransom, and one count of Level 2 Felony Criminal Confinement With Intent to Obtain Ransom.[1] He argues that the convictions were based on improperly admitted evidence and that they violate the continuous crime doctrine. The State concedes that the criminal confinement and Level 5 kidnapping convictions must be vacated. We agree, and remand with instructions to vacate these convictions and resentence Jones accordingly. In all other respects, we affirm.

## Facts

[2] On October 23, 2018, Quantavious Jones asked A.C., with whom he was in a relationship, if he could have a package delivered to her residence the next day. She agreed. On October 24, Jones called A.C. to check on the package, but she said it had not been delivered. He picked her up to investigate. They found the UPS delivery man, who confirmed that he had delivered the package, but said that he had not seen A.C.

[3] Jones then called Irving Madden. Jones told Madden that A.C. had lost his package, and that he and A.C. were coming over to Madden's house. A.C. became suspicious on the ride over. She attempted to exit the moving vehicle,

---

[1] Ind. Code § 35-42-2-1.5(1); I.C. § 35-42-3-2(b)(1)(C); I.C. § 35-42-3-2(b)(3)(A); I.C. § 35-42-3-3(b)(3)(A).

but Jones grabbed her and kept her in the car. When they arrived at Madden's house, A.C. refused to get out of the car. Madden pulled her from the vehicle and dragged her into his house.

[4] Inside, Madden took A.C. to the basement and Jones handcuffed her to a pole or a pipe. A.C. escaped the handcuffs and tried to grab a phone, but Jones took the phone and choked her. He again handcuffed her to the pole. Then he moved her and handcuffed her to a chair in the basement's kitchen.

[5] Jones began questioning A.C. about the package. During the questioning, Madden threw scalding hot water on her from behind. A.C. would later describe the pain of being burned with hot water as "worse than ten." Tr. Vol. II p. 208. A.C. fell onto the floor, and Madden began beating her. Jones pulled Madden away from A.C., who then went into the bathroom where she was ordered to remove her clothes. She was alone for a moment before Madden opened the door and threw more hot water on her naked body. Madden then made A.C. get in the shower, turned on the hot water, and continued hitting her.

[6] At some point, the three returned to the bar area. Madden asked if they should kill A.C., but Jones said they should let her go. Madden found clothes for A.C. and left to get gas. Jones began calling A.C.'s family and friends, asking about the package and demanding $3,000 for A.C.'s release.

[7] When Madden returned, the three got in the car together. A.C. asked to be released on the east side of Indianapolis, where her family lives. Jones drove

east but let A.C. out in an unknown neighborhood. A.C. knocked on the door of one of the houses and the woman that answered let A.C. use her phone.

[8] A.C.'s family picked her up and took her to the local hospital. There, she spoke with a nurse and a detective about what happened. She was later transferred to Eskenazi Hospital. She was put in a shock room, which is an area reserved for "life-threatening things." Tr. Vol. III p. 112. She was treated for abrasions on her face and severe burns on her arms, chest, back, and legs.

[9] Janet Jackson worked with A.C. at Eskenazi as a forensic nurse examiner. Nurse Jackson was trained in caring for victims of trauma, including how to collect evidence. She was instructed to ask patients what happened to them "in order to figure out the appropriate treatment." *Id.* at 93. Nurse Jackson interviewed A.C. several hours after the incident. During this interview, A.C. was "shaking," "shivering," and "grimacing" from the pain. *Id.* at 95-96. A.C. was also "scared" that Jones and Madden were "going to come and find her." *Id.* at 97.

[10] Based on the foregoing chain of events, Jones and Madden were both arrested. On October 29, 2018, the State charged Jones with Level 2 felony robbery resulting in serious bodily injury, Level 3 felony criminal confinement while armed with a deadly weapon, three counts of Level 3 felony aggravated battery, Level 5 felony kidnapping with bodily injury, Level 5 felony battery resulting in serious bodily injury, and Level 6 felony strangulation. Later, the State added

one count of Level 2 felony kidnapping for ransom and one count of Level 2 felony criminal confinement with intent to obtain ransom.

[11] Jones and Madden were co-defendants at a jury trial that started on December 8, 2019. Nurse Jackson testified extensively as to her interview with A.C., recounting A.C.'s description of events from the day before the incident through A.C.'s arrival at Eskenazi. This testimony included an allegation that Jones's missing package contained heroin. Tr. Vol. III p. 106-107. Jones objected to the nurse' testimony on hearsay grounds. The trial court admitted the testimony under two hearsay exceptions: that the statements were excited utterances and that they were made for the purpose of medical diagnosis or treatment.

[12] On December 11, 2019, Jones was convicted of two counts of Level 3 felony aggravated battery, Level 2 felony kidnapping, Level 2 criminal confinement, and Level 5 felony kidnapping. He was found not guilty of Level 3 felony criminal confinement and Level 5 felony battery resulting in serious bodily injury. The State dismissed the other charges before trial. On January 6, 2020, the trial court sentenced Jones to ten years for each aggravated battery count, to run consecutively to each other. The trial court also sentenced him to twenty years for each Level 2 felony and four years for the kidnapping conviction, to be served concurrently with each other and consecutively with the battery convictions. Jones' aggregate term of imprisonment is forty years. Jones now appeals.

# Discussion and Decision

## I.    Hearsay

Jones argues that Nurse Jackson's testimony regarding her interview with A.C. was inadmissible hearsay, and that the admission of this testimony prejudiced Jones. The trial court's decision to admit evidence is discretionary and will be reversed only for an abuse of that discretion. *Lewis v. State*, 34 N.E.3d 240, 247 (Ind. 2015).

Hearsay—an out-of-court statement admitted for the truth of the matter asserted—is generally inadmissible unless it falls under an exception. Ind. Evid. R. 801(c), 802. The State defended admission of the testimony, arguing that A.C.'s statements were excited utterances and that they were made for medical diagnosis or treatment. Tr. Vol. III p. 101, 121. Jones disagreed on both counts.

Jones argues that A.C.'s statements to Nurse Jackson were too attenuated from the stressful event to come in under the excited utterance exception. An excited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Ind. Evid. R. 803(2). There are three elements that must be met for hearsay to be admitted under the excited utterance exception: "(1) a 'startling event or condition' has occurred; (2) the declarant made a statement while 'under the stress or excitement caused by the event or condition;' (3) the statement was 'related to the event or condition.'" *Ramsey v. State*, 122 N.E.3d 1023, 1032 (Ind. Ct. App.

2019).  Excited utterances are thought to be more trustworthy because "the declarant was incapable of thoughtful reflection."  *Yamobi v. State*, 672 N.E.2d 1344, 1346 (Ind. 1996).

[16] The passage of time reduces the likelihood that an utterance is spontaneous.  *Chambless v. State*, 119 N.E.3d 182 (Ind. Ct. App. 2019).  However, "continuing trauma" can "render[] the declarant more reliable."  *Jenkins v. State*, 725 N.E.2d 66, 69 (Ind. 2000).  For example, our Supreme Court held in *Yamobi* that it was reasonable to conclude that a shooting victim's statements were reliable despite being made up to an hour after the shooting, because he "lay on his back bleeding and in pain" during that time and was perhaps incapable of reflection and deliberation. 672 N.E.2d at 1347.

[17] Jones argues that A.C.'s statements did not satisfy the second element because several hours passed between A.C.'s ordeal and her interview with Nurse Jackson.  He suggests that the time that passed and the number of people A.C. spoke with allowed her story to become rehearsed.

[18] However, there is substantial evidence that A.C. suffered "continuing trauma" between the time of the attack and the time Nurse Jackson interviewed her.  A.C. testified that the pain she experienced was "worse than ten."  Tr. Vol. II p. 208.  The woman who helped A.C. call for help testified that A.C. was scared, that "she was crying, her face was busted," and that "her skin was a bubble."  Tr. Vol. III p. 26-28.  One of the police officers who spoke with A.C. at Eskenazi Hospital testified that A.C.'s injuries were "some of the worst injuries

I've seen next to death." *Id.* at 85. Nurse Jackson testified that when she spoke with A.C. hours after the incident, A.C. was still "shaking," "shivering," and "grimacing" from the pain. *Id.* at 95-96.

[19] Given A.C.'s medical condition and her intense pain, it was not against the logic and effect of the facts and circumstances before the trial court to find that A.C. was still under the stress of the event when she spoke with Nurse Jackson, even though it was hours later. Under these circumstances, the trial court did not abuse its discretion by finding that Nurse Jackson's testimony was admissible under the excited utterance exception to the hearsay rule.[2]

## II. Double Jeopardy

[20] Jones argues that this Court should vacate one of his two aggravated battery convictions and both of his kidnapping convictions because they violate the continuous crime doctrine.

[21] While briefs were being filed in this case, our Supreme Court issued two decisions that call into question whether common law double jeopardy

---

[2] Because we find that the testimony was admissible under the excited utterance exception to the hearsay rule, we need not and will not consider whether the statements were also admissible as statements made for the purpose of medical diagnosis or treatment. Moreover, Jones is particularly concerned with Nurse Jackson's statement that the missing package may have contained heroin. Because the trial did not consider any drug offenses, there is little likelihood that the heroin allegation contributed to the verdict.

doctrines such as the continuing crime doctrine still act as independent sources of relief. As we recently stated:

> our Supreme Court . . . significantly altered the approach to claims of double jeopardy that—like the one here—are based on multiple convictions in a single prosecution. *See Wadle v. State*, [151 N.E.3d 227 (Ind. 2020)] and *Powell v. State*, [151 N.E.3d 256 (Ind. 2020)]. The Court distinguished these claims of "substantive double jeopardy" from claims of "procedural double jeopardy"—where a defendant is charged with the same offense in successive prosecutions.

*Hill v. State*, ---N.E.3d---, No. 49G01-1807-F5-21906, slip op. at 3-4 (Ind. Ct. App. Oct. 2, 2020). Before *Wadle* and *Powell*, we reviewed substantive double jeopardy claims under the constitutional tests set out in *Richardson*, or under various common law and statutory rules, like the continuous crime doctrine. 717 N.E.2d 32; *see also Pierce*, 761 N.E.2d at 830. "In *Wadle*, however, the Court overruled the *Richardson* constitutional tests as they apply to claims of substantive double jeopardy. *See Wadle*, [151 N.E.3d at 235]. The Court then set forth two new tests that start with statutory interpretation but that also incorporate, where appropriate, the common-law continuous-crime doctrine." *Wadle*, [151 N.E.3d at 247-49]; *Powell*, [151 N.E.3d at 263-65]." *Hill*, slip op. at 4 (footnote omitted).

[22] Jones argues that this change has nothing to do with his continuous crime doctrine claims and those claims still act as an independent source of review. We disagree. *Wadle* and *Powell* not only overruled the constitutional substantive double jeopardy test in *Richardson*, they also swallowed statutory

and common law to create one unified framework for substantive double jeopardy claims—including the continuous crime doctrine.

[23] With *Wadle* and *Powell*, our Supreme Court intended to end so-called "double jeopardy double talk." *Wadle*, 151 N.E.3d at 244 (quoting Akhil Reed Amar, Double Jeopardy Law Made Simple, 106 YALE L.J. 1807, 1807 (1997)). The Court took issue with *Richardson* for "failing to resolve all double-jeopardy claims under a 'single comprehensive rule,'" causing inconsistent reliance on its constitutional test and "rules of statutory construction and common law." *Id.* at 243. These "separate" and "additional" protections "generat[ed] confusion" and a "patchwork of conflicting precedent." *Id.* at 243-44. The Court did not recite these criticisms only to repeat the confusion inadvertently launched by *Richardson,* "Reading *Wadle* in its entirety, along with *Powell*, it becomes clear that the Court's intent was to do away with all existing rules and tests for substantive double jeopardy, including . . . the *Richardson* constitutional tests . . . and start from scratch with new tests." *Hill*, slip. op. at 6-7. Put simply, if the old substantive double jeopardy analysis was like baking a cake from scratch by using numerous ingredients pulled from common law and statutory rules, *Wadle* and *Powell* are like using a cake mix: the new test allows for more consistent results more efficiently, without having to account for all of the discrete ingredients that may or may not be hiding in the back of the cupboard.

[24] These new tests incorporate principles of statutory interpretation and common law, supplanting both. *Wadle* and *Powell* first require an analysis of the statutory offenses charged. *Wadle*, 151 N.E.3d at 248; *Powell*, 151 N.E.3d at

264.  Second, they require an examination of the underlying facts.  *Wadle*, 151 N.E.3d at 249; *Powell*, 151 N.E.3d at 264.  Pertinent to the case at hand, this second tier of analysis includes the continuous crime test verbatim: the court asks "whether the defendant's actions were 'so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction.'" *Id.* (quoting *Walker*, 932 N.E.2d at 735).  The Court quoted *Walker*, a continuous crime case, and included a footnote explaining the applicability of the continuous crime doctrine to multiplicity claims.  *Wadle*, 151 N.E.3d n.26.  The Court did not simply borrow useful language; it incorporated the continuous crime doctrine into its uniform substantive double jeopardy framework.

[25]  In light of this, Jones's assertion that "the *Powell* decision did not profess to apply the continuous crime doctrine, let alone overrule or displace Indiana law in that area" is mistaken.  Appellant's Reply Brief p. 8.  The test under *Wadle* and *Powell* applies to Jones's multiplicity claim.  And even if it did not, the result would be the same.  Under both the old continuous crime doctrine test and the new uniform substantive double jeopardy test, Jones's battery convictions survive, but his Level 5 felony kidnapping and Level 2 felony criminal confinement convictions must fall.[3]

---

[3] We analyze Jones's claim under both the common law continuous crime doctrine test and the new *Wadle* and *Powell* framework to avoid the potentially sticky question of *Wadle* and *Powell*'s retroactivity.

"Substantive double jeopardy claims principally arise in one of two situations: (1) when a single criminal act or transaction violates multiple statutes with common elements, or (2) when a single criminal act or transaction violates a single statute and results in multiple injuries." *Powell*, 151 N.E.3d at 263. Jones's battery convictions are in the latter category and follow *Powell*;[4] his kidnapping and criminal confinement convictions are in the former category and follow *Wadle*.

## A. *Powell*: Single Act, Multiple Injuries

For acts that violate a single statute but result in multiple injuries, we engage in a two-step process. First, we review the text of the statute to identify the appropriate "unit of prosecution." *Id.* at 265. The unit of prosecution is the minimum action required to commit a new and independent violation of a criminal statute. *Barrozo v. State*, --- N.E.3d ---, No. 19A-CR-2037, slip op. at p 4 (Ind. Ct. App. Sept. 24, 2020) (quoting *United States v. Rentz*, 777 F.3d 1105, 1117 (10th Cir. 2015)). If the unit of prosecution is clear, "we follow the legislature's guidance and our analysis is complete." *Powell*, 151 N.E.3d at 264. If the statute is ambiguous, we must then examine the facts to determine

---

[4] Jones argues that *Powell* is inapplicable to his battery convictions because it deals with offenses resulting in the injury or death of multiple victims, rather than multiple injuries of one victim. Appellant's Reply Brief p. 8. *Powell* is not so limited. In its introduction, *Powell* asks, "Does every punch thrown upon a single victim amount to a separate act of battery?" 151 N.E.3d at 261. What follows is clearly intended to answer that question. "[W]e ask whether 'the same act may be twice punished,' as 'two counts of the same offense.'" *Id.* at 263. Although *Wadle* limits *Powell's* scope to "when a single criminal act or transaction violates a single statute *but harms multiple victims*," *Wadle*, 151 N.E.3d at 247 (emphasis added), *Powell* describes itself as applying "when a single criminal act or transaction violates a single statute *and results in multiple injuries*," *Powell*, 151 N.E.3d at 263 (emphasis added). *Powell* provides the more precise description of its own content.

whether the defendant's actions are "so compressed in terms of time, place, singleness of purpose and continuity of action as to constitute a single transaction." *Id.* (citing *Walker*, 932 N.E.2d at 735). We review questions of statutory law *de novo*. *Id.* at 262.

[28] To assist in determining the unit of prosecution, *Powell* distinguished conduct-based statutes from result-based statutes:

> A *conduct*-based statute . . . consists of an offense defined by certain actions or behavior (*e.g.*, operating a vehicle) and the presence of an attendant circumstance (*e.g.*, intoxication). . . . A *result*-based statute, on the other hand, consists of an offense defined by the defendant's actions *and* the results or consequences of those actions.

*Id.* at 265-66 (emphases original). Examples of result-based statutes include murder, manslaughter, reckless homicide, and battery. *Id.*

## 1. Battery Convictions

[29] First, we consider Jones's two aggravated battery convictions. "A person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death or causes: (1) serious permanent disfigurement . . . commits aggravated battery, a Level 3 felony." Ind. Code 35-42-2-1.5(1). This is a result-based statute, because the result—injury that creates a substantial risk of death or causes serious permanent disfigurement—"is part of the definition of the crime." *Powell*, 151 N.E.3d at 266 (quoting *Kelly v. State*, 527 N.E.2d 1148 (Ind. Ct. App. 1988). "'Where several . . . injuries occur in the course of a

single incident,' the prohibited offense has been perpetrated 'several times over.'" *Id.* (quoting *Kelly*, 527 N.E.2d 1148).[5]  Accordingly, each time Madden threw hot water on A.C. could support a separate battery claim.  However, how this result-based statute applies when there is a single victim who suffered multiple, substantially similar injuries because of multiple instances of the same act is ambiguous.

[30]  Because of this ambiguity, we move onto the second step in the *Powell* analysis and examine whether the acts were "so compressed in terms of time, place, singleness of purpose and continuity of action as to constitute a single transaction." *Powell*, 151 N.E.3d at 264.  Importantly, this step is the same as the continuous crime doctrine analysis.  If the acts will bear separate charges under this prong of *Powell*, they will also bear separate charges under the continuous crime doctrine.

[31]  The two acts of throwing hot water on A.C. did not constitute a single transaction.  First, they did not occur at the same time.  A.C. testified that after the first act, she fell to the floor, crawled away from her attackers, was beaten, went to the bathroom, started taking off her clothes, and was alone for a moment before more hot water was thrown on her.  Second, Madden did not fling scalding hot water on A.C.  in the same place.  The first act happened near

---

[5] Although *Powell* and its primary citing authority for this proposition, *Kelly*, involve multiple victims, it follows that when the unit of prosecution is intentionally-inflicted injury, as in battery, and a single victim suffers multiple intentionally-inflicted injuries, the offense has potentially been committed multiple times, depending on how the offenses were charged and the facts adduced at trial.

the kitchen, and the second act happened in the bathroom. Third, the acts did not share a purpose. The first act was part of an interrogation; the second act was punitive. Because one battery occurred while A.C. was clothed, and one while she was not, it would be reasonable to infer that they resulted in different injuries.

[32] Jones argues that *Gomez v. State*, 56 N.E.3d 697 (Ind. Ct. App. 2016), in which this Court applied the continuous crime doctrine to reverse two of the defendant's domestic battery convictions, requires reversal here. However, unlike *Gomez*, where the defendant engaged in a continuous, three-minute-long battery to remove his ex-wife from his property, the facts in this case indicate that Madden's acts were not part of a continuous attack, but a punctuated one. *Gomez v. State*, 56 N.E.3d 697 (Ind. Ct. App. 2016). Accordingly, we affirm Jones's conviction on two counts of aggravated battery.

## 2. Kidnapping Convictions

[33] Next, we consider Jones's kidnapping convictions, one for Level 5 felony kidnapping and one for Level 2 felony kidnapping. The State concedes that both convictions cannot stand. We elect to evaluate these convictions notwithstanding the State's concession, because *Powell* substantially altered the relevant analysis.

[34] "A person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another, commits kidnapping." Ind. Code § 35-42-3-2(a). One of Jones's charges was elevated to

a Level 5 felony because the kidnapping resulted in "bodily injury to a person other than the removing person," and the other was elevated to a Level 2 felony because it was committed "with intent to obtain ransom." §35-42-3-a(b)(2), (b)(4). Unlike battery, kidnapping is a conduct-based crime defined by the defendant's actions, rather than the result of those actions. The gravamen of the offense is removal; a particular result or motive can elevate the offense, but does not form the basis of a second, discrete offense. *See, e.g., Barrozo*, ---, No. 19A-CR-2037, slip op. at p 6 (holding that the result of an act of reckless driving offense can elevate the offense, but does not constitute a separate offense).

[35] Jones's actions only constituted one kidnapping offense under the statute. In its charging information, the State described only one removal, "from a car into a house." App. Vol II p. 136. The only things that distinguish the Level 2 conviction (injury) from the Level 5 conviction (ransom) are result and motive. These are not the units of prosecution for kidnapping. Because only one kidnapping offense was committed, only one can stand.

[36] The State concedes that the Level 5 felony conviction should be vacated. We agree. As the State satisfied its burden for both felonies, the lesser felony should fall. *See, e.g., Moala v. State*, 969 N.E.2d 1061, 1065 (Ind. Ct. App. 2012) (observing that generally, "when a double jeopardy violation is found, the reviewing court simply orders the conviction that is the lower class of crime to be vacated"). Accordingly, we remand with instructions to vacate the Level 5 felony kidnapping conviction and resentence Jones accordingly.

# B. *Wadle*: Single Act, Multiple Statutes

[37]    Having determined that the Level 5 felony kidnapping conviction cannot stand, we turn to the Level 2 felony kidnapping and criminal confinement convictions. The State concedes that the acts underlying these convictions were continuous, and that the criminal confinement conviction must fall. We agree. Still, we review these convictions notwithstanding the State's concession because *Wadle* significantly altered the relevant analysis.

[38]    *Wadle*'s two-part inquiry applies when a single act or transaction implicates multiple statutes. *Wadle*, 151 N.E.3d at 235. First, we look to the statutes under which the defendant was charged.

> If either statute clearly permits multiple punishment, whether expressly or by unmistakable implication, the court's inquiry comes to an end and there is no violation of substantive double jeopardy. But if the statutory language is not clear, then a court must apply our included-offense statutes to determine whether the charged offenses are the same. *See* I.C. § 35-31.5-2-168. If neither offense is an included offense of the other (either inherently or as charged), there is no violation of double jeopardy.

*Id.* at 253. If one offense is included in the other, we move onto the second step of our analysis and examine the underlying facts.

> If, based on these facts, the defendant's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction," then the prosecutor may charge the offenses as alternative sanctions

only. But if the defendant's actions prove otherwise, a court may convict on each charged offense.

*Id.*

[39] Here, we consider Jones's criminal confinement and kidnapping convictions. "A person who knowingly or intentionally removes another person by fraud, enticement, force, or threat of force, from one place to another commits kidnapping." Ind. Code 35-42-3-2(a). "A person who knowingly or intentionally confines another person without the person's consent commits criminal confinement." Ind. Code 35-42-3-3(a). Neither statute by its text permits multiple punishment.

[40] Next, we turn to our included offense statutes. "Whenever: (1) a defendant is charged with an offense and an included offense in separate counts; and (2) the defendant is found guilty of both counts; judgment and sentence may not be entered against the defendant for the included offense." Ind. Code § 35-38-1-6. An "included offense" is one that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or

> public interest, or a lesser kind of culpability, is required to establish its commission.

Ind. Code § 35-31.5-2-168. If neither offense is included in the other, there is no double jeopardy violation. *Wadle*, 151 N.E.3d at 248.

[41] Criminal confinement requires proof of the same but fewer criminal elements as kidnapping.[6] A kidnapper must act "by fraud, enticement, force, or threat of force," whereas criminal confinement must be done without consent. Consent is a "voluntary yielding to what another proposes or desires." Consent, Black's Law Dictionary (11th ed. 2019). Non-consent is established by the methods noted in the statute of "fraud, enticement, force, or threat of force." Kidnapping requires removal from one place to another, while criminal confinement requires an act of confinement. In removing someone from one place to another, a kidnapper has confined that person to those places. The element of confinement is a necessary part of forced removal. As such, confinement is a lesser included offense of kidnapping.

[42] The enhancements are also identical. Jones was convicted of Level 2 felony kidnapping due to his "intent to obtain ransom." Ind. Code § 35-42-3-

---

[6] Prior to 2013, this proposition was well-established in Indiana law. *See, e.g.*, *Koch v. State*, 952 N.E.2d 359 (Ind. Ct. App. 2011); *Taylor v. State,* 879 N.E.2d 1198 (Ind. Ct. App. 2008). A 2013 amendment to the kidnapping statute that eliminated the language that "[a] person who knowingly or intentionally confines another person: (1) with intent to obtain a ransom . . . commits kidnapping . . ." requires that we re-evaluate the relationship between these two statutes. H.B. 1006, 118th Gen. Assemb., 1st Reg. Sess. (Ind. 2013).

3(b)(4)(A). His intent to obtain a ransom also elevated the criminal confinement conviction to a Level 2 felony. Ind. Code § 35-42-3-3(b)(4)(A).

[43] Because criminal confinement is included in kidnapping as charged, we must move to the second step of the *Wadle* analysis. If Jones's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction," then Jones's convictions for both criminal confinement and kidnapping violate double jeopardy. Again, this is the same analysis that is required under the continuous crime doctrine. *See, e.g.*, *Walker*, 932 N.E.2d 733.

[44] The facts that prove confinement are identical to the facts that prove kidnapping. A.C. was forced out of the car into the basement where she was handcuffed. This single transaction satisfied the elements of both crimes. Both charges were then elevated because she was taken with intent to collect a ransom. The defendant's actions were compressed in terms of time, place, singleness of purpose and continuity of action because they were the same actions. Convicting Jones of both kidnapping and criminal confinement therefore violated the prohibition on substantive double jeopardy. We remand with instructions to vacate the criminal confinement conviction in line with the included offense statute and to resentence accordingly. Ind. Code § 35-38-1-6.

[45]     The judgment of the trial court is remanded with instructions to vacate the
Level 2 felony criminal confinement and Level 5 felony kidnapping convictions
and resentence Jones accordingly.  In all other respects, we affirm.


Bailey, J., concurs.
Vaidik, J., concurs with a separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Quantavious Jones,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

Court of Appeals Case No.
20A-CR-202

**Vaidik, J., concurring.**

I concur in full with the well-reasoned lead opinion, but I write separately to add an observation about applying *Wadle* and *Powell* to future cases. Because the ground recently shifted in double-jeopardy analysis, our Court and the trial courts will be asked to sort out scenarios we can only now imagine. It is attractive, yet unrealistic, to believe that these two tests can be superimposed on any future contingencies and provide the answer to all our double-jeopardy queries. Neither test may provide the perfect fit. Instead of trying to cram each possibility into the *Wadle* bucket or the *Powell* bucket, we should be guided by the principles expounded in the two cases.

[47] Neither the *Wadle* test nor the *Powell* test applies neatly to Jones's two kidnapping convictions: a defendant convicted multiple times under a single statute for a single criminal act against a single victim where multiple enhancing circumstances under the statute are present. However, a controlling principle can be distilled from *Powell*: there can never be multiple convictions under a single statute unless there are multiple victims or multiple criminal acts, or both. Because Jones's two kidnapping convictions are based on a single criminal act (one act of kidnapping) against a single victim (A.C.), only one conviction may stand. Tacking multiple enhancing circumstances on a single criminal act does not alter that conclusion. The underlying crime has still been committed only once. *See Powell*, 151 N.E.3d at 266 ("To be sure, a specific result or consequence (e.g., death or serious bodily injury) may enhance the penalty imposed. But multiple consequences do not establish multiple crimes, since the crime may still be committed without the consequence." (cleaned up)). As such, I concur that one of Jones's kidnapping convictions must be vacated.