FILED

Apr 30 2019, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brian Ramsey, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | April 30, 2019 <br><br> Court of Appeals Case No. 18A-CR-1276 <br><br> Appeal from the Floyd Superior Court <br><br> The Honorable Susan D. Orth, Judge <br><br> Trial Court Cause No. 22D01-1711-F5-2392 |

**Tavitas, Judge.**

## Case Summary

[1]     Brian Ramsey appeals his convictions for criminal confinement, a Level 5

felony, and intimidation, a Level 6 felony.  We affirm.

# Issues

Ramsey raises two issues on appeal, which we restate as follows:

    I.      Whether the trial court abused its discretion in admitting certain evidence.

    II.    Whether sufficient evidence supports Ramsey's conviction for intimidation.

# Facts

During the relevant period, Rhonda Crone ("Rhonda") and her husband, Bruce Crone[1] ("Bruce"), separated, and Rhonda began dating Ramsey. From November 4 to November 11, 2017, Ramsey and Rhonda were live-in guests of Rhonda's niece, Cassandra Butcher (a.k.a. Cassandra Crone), in Cassandra's Floyd County apartment. During the visit, Cassandra accused Rhonda of having an affair with Cassandra's husband. Ramsey became angry and beat Rhonda viciously over the ensuing three or four days.

On November 10, 2017, a neighbor overheard the commotion and called the police. When responding police officers knocked at the door, Ramsey kept Rhonda and Cassandra in a bathroom and would not allow them to answer the door. At one point, Ramsey left the apartment; however, before he left,

---

[1] Bruce Crone is Ramsey's cousin.

Ramsey told Rhonda and Cassandra that he would kill their children if they left the apartment.

[5] On November 11, 2017, Rhonda's brother, James Clemons, became concerned because he had not heard from Rhonda, could not reach her on her cell phone, and had not seen any online activity from her in nearly two weeks. Clemons looked for Rhonda at her son's house and then contacted Bruce. Bruce told Clemons that Rhonda was visiting Cassandra. Clemons and Bruce went to Cassandra's apartment together. When they arrived, Ramsey was not there. Rhonda and Cassandra were "terrified." Tr. Vol. I p. 118. Rhonda was so badly battered that Clemons did not recognize her and "thought all of her bones in her face w[ere] broke[n]." *Id*. at 114. Rhonda told Clemons that Ramsey had beaten her. Rhonda was afraid to be there when Ramsey returned. Clemons called the police.

[6] Officer Tim Wells of the New Albany Police Department was among the officers who responded to the scene. Rhonda and Cassandra reported that Ramsey held them against their will for four days and had threatened to harm their children if Rhonda and Cassandra left the apartment. Officer Wells observed that Rhonda exhibited "behavior . . . of someone that had, to me, had been through a traumatic ordeal and she was very upset and almost to the point of [being] inconsolable"; Rhonda was "visibly shaken [and] nervous" and had "[e]xtremely severe" injuries, including black eyes, facial bruises and fractures,

and significant bruising all over her body.[2]  *Id.* at pp. 143, 158.  Rhonda was transported to Floyd Memorial Hospital, where she remained admitted for three days; she was then transferred to an Indianapolis hospital for an additional three or four days.  Cassandra appeared uninjured.

[7]     Officer Wells interviewed Rhonda at the hospital.  Rhonda again reported that Ramsey accused her of infidelity; beat her over a three-day span; destroyed her phone when she tried to call the police; stopped her from speaking with responding police on November 10, 2017; prevented both Rhonda and Cassandra from leaving Cassandra's apartment; and threatened to harm Rhonda's and Cassandra's children if they left the apartment.

[8]     Officer Wells later returned to Cassandra's apartment and found Ramsey there. Ramsey maintained that Rhonda was lying; he denied hitting or confining Rhonda or Cassandra, breaking Rhonda's phone, and preventing Rhonda and Cassandra from speaking to the police.  He also denied threatening Rhonda's and Cassandra's children and implied that Rhonda's injuries were self-inflicted. Ramsey conceded that he might have injured Rhonda in his efforts to protect her from self-harming and implicated Cassandra as the suspect.

[9]     On November 13, 2017, the State charged Ramsey with various offenses stemming from the attack on Rhonda.  The State subsequently amended the

---

[2] In all, Rhonda suffered "multiple facial fracture[s], extensive rib fracture[s] on [her] sides, [a] spine fracture, . . . extensive resolving ecchymosis around her eyes[,]" and a fractured scapula.  Exhibits Vol. I p. 6.

information to reflect the following charges: Count I, criminal confinement, a Level 5 felony; Count II, domestic battery, a Level 6 felony;[3] Count III, intimidation, a Level 6 felony; Count IV, interference with the reporting of a crime, a Class A misdemeanor; and Count V, a habitual offender enhancement.[4]

[10] At the final pretrial conference in January 2018, the State reported that, in a departure from her initial cooperative behavior, Cassandra was now "acting differently, not being responsive to the [State's] phone calls, changed [her] number and didn't, uh, give [ ] an update and ha[d] not been responsive to visits to her address by [police] investigators." *Id.* at 18. Also, the State advised the trial court that multiple agencies had tried and failed to find Cassandra. Days before trial, Rhonda recanted her previous statements implicating Ramsey.[5]

[11] The trial court conducted Ramsey's jury trial on February 19 and 20, 2018. The State's witnesses testified to the foregoing facts. When the State moved to admit Rhonda's medical records, defense counsel objected.[6] The State argued

---

[3] The State charged Ramsey with domestic battery as a Level 6 felony because he had a prior domestic battery conviction.

[4] Ramsey has the following prior convictions: failure to return to lawful detention, a Class D felony (1994); battery, a Class D felony (2000, 2001); and robbery, a Class C felony (2008).

[5] Rhonda appeared for a deposition on February 16, 2018. In her deposition testimony, Rhonda denied that: (1) Ramsey prevented her from leaving Cassandra's apartment; (2) Ramsey threatened her; or (3) she or Cassandra tried to call 911.

[6] Although defense counsel did not object as explicitly as we would prefer, we find that he adequately lodged his objection when he questioned how some of the statements were reasonably pertinent to rendering medical aid to Rhonda such that the statements could properly be admitted pursuant to hearsay exceptions.

that Rhonda's statements that Ramsey had threatened to harm her children were allowable under the hearsay exception for statements made for medical diagnosis or treatment. Counsel for the State argued:

> It's very clear in the rule of 803(4), [ ] a statement made by a person seeking medical diagnosis or treatment, and it is made reasonably pertinent to medical diagnosis or treatment, and describes the medical history, past or present symp-symptoms. Right, it is, [ ] they're attempting to treat her, but that's the theory behind it. If you're asking a patient what happened to you, we're trying to treat you.

*Id.* at 131. Defense counsel objected to narrative aspects of the medical records on the grounds that the narratives contained irrelevant information; the defense was "unable to cross examine any person who observed that or put that into the notes into the record"; and because the narratives "read more like a probable cause affidavit" than guidance to medical service providers.[7] *Id.* at 127. In discussing the admissibility of the narratives, defense counsel and the trial court engaged in the following exchange:

> [Defense counsel]: [ ] I don't believe she talked about being separated. I know that Mr. Clemons said, but not Ms. Crone. [S]he did say that she was staying at her niece[']s. [ ] I don't see her being unemployed and no source of income has any baring [sic] or relevance on her injuries or how she had been diagnosed or how that's helpful. [A]nd again, what-what the medical

---

[7] Defense counsel did not lodge his hearsay objection as explicitly as we would prefer; however, we deem his remarks to the trial court regarding the medical records to suffice for our purposes here.

personnel should be concerned with and for that, for evidentiary purposes of substantiating her injury (about three words indiscernible)[.]

THE COURT: Well, I-I agree that how an injury occurred, how old an injury is, how length of time it-it occurred over are all things that are relevant and I think this all goes--

[Defense counsel]: I mean . . . .

THE COURT: --toward that assessment. . . .[S]o let me, [ ] overrule your objection to that extent, but what I'm looking at right now is in narrative number 4. I'm still struggling with that.

[Defense counsel]: Right. I believe that's not relevant.

[Counsel for the State]: We can redact narrative number 4.[8]

*Id.* at 131-32.

[12]    The State then introduced Rhonda's medical records that described Rhonda's "[h]istory of present illness," as follows:

47 year old female came was hit by her boy friend three days in a row, tuesday, wednesday and thursday. her brother went on to check on her and found her bruised up, called 911 and following this brought into ER and we were asked to admit the patient for further care. patient underwent extensive radiological workup in

---

[8] The trial court ordered redaction of CM Narrative 4, pertaining to Ramsey's alleged threats to Cassandra and Rhonda.

ER which include ct scan head, spine, chest and x.ray [sic] which revealed multiple facial fracture, extensive rib fracture on sides, also spine fracture.

Exhibits Vol. I p. 6 (punctuation and capitalizations in original). Another medical entry provided:

Patient is a 47[ ]year old white female who was being beaten by her boyfriend, and she says held captive in his home. Her brother knew something was wrong because she wasn't answering her phone, but he did not know where she was staying. He [Clemons] tracked her down and called 911 and she was brought to ER . . . . She was found to have multiple facial fractures, rib fractures and spine fracture and was admitted for further care.

*Id.* p. 13. An additional medical entry describes Rhonda as a "47-year old female involved in a domestic violence incident coming in through the emergency department extremely battered." *Id.* at 18. The records also state the "Assessment/Plan" as involving "[d]omestic violence" and warranting "[s]ocial worker and [c]ase manager for safe discharge planning." *Id.* at 65. The narrative portions of Rhonda's medical records aimed at "[d]ischarge [p]lanning" state:

[CM Narrative 1]:

I met with patient at bedside today for interview due to domestic violence to assess safe DC [discharge] planning. Patient is married but she and her spouse have been separated for a few years now. Patient is currently dating her spouse's cousin, Brian Ramsey.

[CM Narratives 2 and 3]:

Patient and Brian have been staying at patient's spouse's niece's home. Patient is unemployed and has no source of income. Patient reported a few days ago her niece began telling Brian that she was having an affair with her spouse. Brian became extremely angry and began beating patient for 3 days. I asked patient if her niece was present when he was beating her and she stated yes, but she has mixed feelings on if she is upset with her or not for not going to get help or call for help because [redacted].

[CM Narratives 4 and 5]:

[Redacted]. Patient also reported that the niece was coming and going from the house the 3 days Brian kept her captive. Patient reported her brother was unable to contact her and became worried so he went to her spouse's home, and that is what led to the discovery of the patient.

[CM Narrative 6]:

[Redacted]. Patient reported she plans to testify against Brian this time.

Exhibits Vol. I p. 119.

[13] During the State's case in chief, the State asked Officer Wells what Rhonda stated had happened to her. Defense counsel objected on hearsay grounds. The trial court overruled the objection. Officer Wells testified that Rhonda stated "that she[ ] and [Cassandra] had been held captive in their apartment [ ]

for the past three (3) to four (4) days and that during that course of time she had [been] beaten severely by [Ramsey]." Tr. Vol. I p. 146.

[14] Next, Rhonda testified that Ramsey accused her of infidelity and hit her. *Id.* at 102-03. Rhonda denied ever calling 911 for help; denied that Ramsey prevented her from leaving the apartment; and denied that Ramsey threatened or intimidated her to make her stay in the apartment. Rhonda testified that Cassandra hit her with a fist and struck her in the face, head, and ribs with a heavy flashlight. Rhonda also testified that she had initially blamed Ramsey, who was innocent, at Cassandra's and Clemons' urging. Rhonda testified further that Ramsey intervened to help her when Cassandra attacked her, and that she loves and wants to be in a relationship with Ramsey.

[15] Then, Clemons testified that he "found [Rhonda] battered and she told [him] that Brian Ramsey had done it and she was so severely beaten [he] naturally called the police*." Id.* at 113, 114, 115. Clemons testified that, at the hospital, Rhonda expressed fear that Ramsey would "come back and kill [her]."[9] *Id.* at 119.

[16] The jury found Ramsey guilty of Count I, criminal confinement, a Level 5 felony; Count II, domestic battery, a Class A misdemeanor; Count III, intimidation, a Level 6 felony; and Count IV, interference with the reporting of

---

[9] Defense counsel did not object to Clemons' testimony as hearsay.

a crime, a Class A misdemeanor. Ramsey subsequently admitted[10] that he was a habitual offender. At Ramsey's sentencing hearing on April 17, 2018, the trial court sentenced him as follows: Count I, six years; Count II, one year; Count III, two and one-half years; and Count IV, one year. The trial court ordered the sentences to be served concurrently, but enhanced the sentences by an additional six years because Ramsey was a habitual offender. Ramsey, thus, received an aggregate sentence of twelve years; he now appeals.

## Analysis

### I.    *Admission of Evidence*

[17]    A trial court has broad discretion in ruling on the admissibility of evidence, and we disturb those rulings only upon an abuse of that discretion. *Carr v. State*, 106 N.E.3d 546, 552 (Ind. Ct. App. 2018), *trans. denied*. An abuse occurs only where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Cole v. State*, 997 N.E.2d 1143, 1145 (Ind. Ct. App. 2013). There is a strong presumption that the trial court properly exercised its discretion. *Warner v. State*, 773 N.E.2d 239, 247 (Ind. 2002). We will not reverse a trial court's evidentiary ruling if we may sustain it on any ground. *See Crawford v. State*, 770 N.E.2d 775, 780 (Ind. 2002).

---

[10] In exchange for Ramsey's admission that he was a habitual offender, the State agreed to forgo elevating Count II, the domestic battery conviction, to a Level 6 felony.

[18] As a panel of this court has previously noted, "[p]olice investigation of domestic violence involves a unique set of circumstances: 'In domestic dispute situations, responses to police officers' initial inquiries may often be, but are not always, non-testimonial, because the officers may need to investigate and identify the persons involved in order to assess the situation, the threat to their safety, and the potential danger to the victim.'" *King v. State,* 985 N.E.2d 755, 758 (Ind. Ct. App. 2013).[11]

### A. Rhonda's Statements in Medical Records

[19] Ramsey argues that the trial court abused its discretion in admitting into evidence Rhonda's medical records, in which Rhonda stated that Ramsey prevented her from leaving Cassandra's apartment by threatening to harm Rhonda's children. Specifically, Ramsey argues that narrative portions of the medical records admitted into evidence constituted hearsay that did not qualify under the medical records exception of Indiana Evidence Rule 803(4).

[20] Hearsay is "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Indiana Evid. R. 801(c). Hearsay is not admissible except as provided by law or by other court rules. Ind. Evid. R. 802.

---

[11] Here, the Confrontation Clause is not implicated because Rhonda testified at trial, and Ramsey had an opportunity to cross examine her. *See also Michigan v. Bryant*, 562 U.S. 344, 362 n.9, 131 S. Ct. 1143, 1157 n.9 (2011) (holding that statements made for purposes of medical diagnosis and treatment are the sorts of non-testimonial statements that do not give rise to Confrontation Clause protection).

Indiana Evidence Rule 803(4) provides:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . .
>
> (4) Statement Made for Medical Diagnosis or Treatment. A statement that:
>
>> (A) is made by a person seeking medical diagnosis or treatment;
>>
>> (B) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and
>>
>> (C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause.

This exception is "based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely that the declarant would mislead the medical personnel person she wants to treat her." *Palilonis v. State,* 970 N.E.2d 713, 726 (Ind. Ct. App. 2012) (quoting *Miles v. State,* 777 N.E.2d 767, 771 (Ind. Ct. App. 2002)), *trans. denied.* In order to satisfy the requirement of the declarant's motivation, the declarant must subjectively believe that he or she was making the statement for the purpose of receiving medical diagnosis or treatment. *See* 13 Robert Lowell Miller Jr., *Indiana Practice: Indiana Evidence* § 803.104 at 312 (4th ed. 2018).

[22]   There is a two-step analysis for determining whether a statement is properly admitted under Indiana Evidence Rule 803(4): "(1) whether the declarant is motivated to provide truthful information in order to promote diagnosis and treatment; and (2) whether the content of the statement is such that an expert in the field would reasonably rely upon it in rendering diagnosis or treatment." *Palilonis,* 970 N.E.2d at 726 (quoting *Nash v. State,* 754 N.E.2d 1021, 1023-1024 (Ind. Ct. App. 2001), *trans. denied*).

[23]   Here, Rhonda presented for medical treatment with "multiple facial fracture[s], extensive rib fracture[s] on [her] sides, also [a] spine fracture, . . . extensive resolving ecchymosis around her eyes[,]" and a fractured scapula, after being beaten savagely over a three-day span. Exhibits Vol. I p. 6. Based on the severity of Rhonda's injuries, we find that she was motivated to provide truthful information to her medical providers in order to promote diagnoses and treatment.

[24]   The record further reveals that, as a result of the multi-day beating and the delayed medical intervention, Rhonda's injuries were in different stages of severity and healing. In order to properly treat Rhonda, to craft an effective discharge plan and to prescribe an appropriate course of psychological counseling, Rhonda's medical providers needed to understand the circumstances surrounding Rhonda's injuries, including the likelihood that she would renew her relationship with her abuser. As the trial court reasoned, and we agree, "how an injury occurred, how old an injury is, [the] length of time it-

it occurred over are all things that are relevant and . . . all go[ ] . . . toward that [medical] assessment." Tr. Vol. I pp. 131-32.

[25] We, therefore, find that the circumstances surrounding Ramsey's attack on Rhonda, the protracted three-day beating, the delay in medical treatment, and the fact that Rhonda was, at times, unguarded and free to leave the apartment but would not for fear of Ramsey, are circumstances that medical providers would reasonably rely upon in rendering diagnosis or treatment to a domestic violence victim.

[26] For these reasons, we conclude that Rhonda's statements, as contained within her medical records, and in which she describes Ramsey's protracted attack and her delay in receiving vital medical attention, were made in the course of medical treatment and fall under the hearsay exception of Rule 803(4). Rhonda's statements describe her "pain or sensations; their inception; [and] their general cause"; were made to medical personnel while Rhonda sought medical treatment; and were made for, and were reasonably pertinent to, medical diagnosis or treatment. *See* Ind. Evidence Rule 803(4). Accordingly, we find that the trial court's decision to admit Rhonda's medical records was not clearly against the logic and effect of the facts and circumstances before the court. *See Perry v. State*, 956 N.E.2d 41, 50 (Ind. Ct. App. 2011) (upholding admission of medical records under Indiana Evidence Rule 803(4) where records included statements that the victim was grabbed around her neck and strangled, because those statements were pertinent to diagnosis and treatment of the victim's injuries).

### B. Rhonda's Statements to Officer Wells

[27] Next, Ramsey argues that the trial court abused its discretion in allowing Officer Wells to testify regarding Rhonda's statements that Ramsey confined her. A trial court may admit hearsay that qualifies under the excited utterance exception. *See* Ind. Evidence Rule 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" and is not excluded by the hearsay rule. *Id*.

[28] To meet the excited utterance exception, three elements must be present: (1) a "startling event or condition" has occurred; (2) the declarant made a statement while "under the stress or excitement caused by the event or condition;" and (3) the statement was "related to the event or condition." *Lawrence v. State,* 959 N.E.2d 385, 389 (Ind. Ct. App. 2012), *trans. denied.*

[29] This test is not "mechanical" and admissibility turns "on whether the statement was inherently reliable because the witness was under the stress of the event and unlikely to make deliberate falsifications." *Sandefur v. State,* 945 N.E.2d 785, 788 (Ind. Ct. App. 2011). The lapse of time is not dispositive, but if a statement is made long after a startling event, it is usually "less likely to be an excited utterance." *Teague v. State*, 978 N.E.2d 1183, 1187 (Ind. Ct. App. 2012)*. See Chambless v. State,* 119 N.E.3d 182, 189 (Ind. Ct. App. 2019) ("The longer the time between an event and an utterance, the greater the likelihood that the statement is a narrative of past events instead of an excited utterance.").

[30] "The heart of the [excited utterance] inquiry is whether the declarant was incapable of thoughtful reflection." *Teague*, 978 N.E.2d at 1187 (quoting *Jones v. State,* 800 N.E.2d 624, 627 (Ind. Ct. App. 2003)). The rationale behind admitting excited utterances is that startling events and absence of opportunity for reflection vest the statements with reliability and reduce the likelihood of falsification. *See* 13 Robert Lowell Miller Jr., *Indiana Practice: Indiana Evidence* § 803.102 at 307-09 (4th ed. 2018).

[31] The record here reveals that Officer Wells interviewed Rhonda shortly after she was "rescued" from Cassandra's apartment. Officer Wells later testified that Rhonda exhibited "behavior . . . of someone that . . . had been through a traumatic ordeal and she was very upset and almost to be point of [being] inconsolable"; was "visibly shaken," "nervous," and had "[e]xtremely severe" injuries all over her body. Tr. Vol. I p. 143, 158. Rhonda's contemporaneous medical records on November 11, 2017, describe her as "very tearful, "anxious," "frightened," requiring "emotional support," "tense," "restless." Exhibits Vol. I pp. 92, 94, 95, 97, 112.

[32] Based on the foregoing, we conclude that Rhonda made the statements implicating Ramsey while she was under the stress of excitement from the attack; and the trial court's decision, pursuant to Rule 803(2), to admit Rhonda's statements that Ramsey confined her was not an abuse of discretion.

The trial court did not abuse its discretion in admitting the statements under the excited utterance exception to the hearsay rule.[12]

## II.    *Sufficiency of the Evidence*

[33]    Lastly, Ramsey argues that the evidence is insufficient to support his conviction for intimidation, a Level 6 felony.  When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State*, 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State*, 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*).  Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'"  *Id*. (quoting *Bieghler*, 481 N.E.2d at 84).  "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'"  *Id*.; *see also McCallister v. State*, 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court").  Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of the crime

---

[12] Even if we had found error here, we have already found that Rhonda made similar statements—properly admitted pursuant to Evidence Rule 803(4)—to her medical care providers.  *See Bowman v. State,* 73 N.E.3d 731, 734 (Ind. Ct. App. 2017)  ("The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction.").

proven beyond a reasonable doubt." *Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007)).

[34] The intimidation statute provides that a person who "communicates a threat to another person, with the intent . . . that the other person engage in conduct against the other person's will" commits intimidation as a Class A misdemeanor. Ind. Code § 35-45-2-1(a)(1). The offense is a Level 6 felony when the threat is to commit a forcible felony. I.C. § 35-45-2-1(b)(1). To convict Ramsey, the State was required to prove that Ramsey communicated a threat to commit a forcible felony—his threat on Rhonda's life—with the intent that Rhonda engage in conduct against her will—staying in Cassandra's apartment. *See* App. Vol. II p. 16.

[35] Ramsey argues that "there was no evidence that Ramsey threatened Rhonda with the intent that she engage in conduct against her will." Appellant's Br. p. 28. We cannot agree. The evidence most favorable to the verdict is that, after accusing Rhonda of infidelity, Ramsey beat Rhonda over a three-day period of time. Rhonda identified Ramsey as her attacker and reported that Ramsey threatened to harm Rhonda's children if she left the apartment. Clemons testified that Rhonda and Cassandra seemed terrified when he arrived at the apartment, and that, upon rescue, the women were both afraid to leave the apartment and afraid to be in the apartment when Ramsey returned.

[36] A reasonable inference may be drawn, from the severity of Rhonda's injuries and her three-day delay in seeking medical treatment, that Ramsey confined

Rhonda. Specifically, one can reasonably infer that, in Rhonda's condition, she did not willingly forgo medical assistance for her fractured face, ribs, scapula, and spine—injuries that required a full week of hospitalization to treat.

[37] Further, although Ramsey attempted to implicate Cassandra in the brutal attack on Rhonda, the admitted medical records reveal that Rhonda permitted Cassandra to stay with Rhonda in her hospital room on the first night of her hospitalization, and that Rhonda "was ok[ay] with [Cassandra staying]."[13] Exhibits Vol. I p. 92. Cassandra's presence in Rhonda's hospital room overnight, on Rhonda's first night free from confinement, invites the inference that another person – and not Cassandra – caused Rhonda's injuries.

[38] Further still, the jury heard Rhonda's testimony that: (1) Ramsey accused her of infidelity; (2) Ramsey battered her; (3) Ramsey did not threaten or intimidate her against calling 911 or calling for help; (4) Ramsey tried to protect Rhonda from Cassandra; (5) Rhonda did not know why she did not call the police; and (6) Rhonda still loved Ramsey and still wanted to be in a relationship with Ramsey at the time of the trial. The jury made a credibility assessment regarding the reliability and veracity of Rhonda's trial testimony, especially in light of Rhonda's stated desire to remain Ramsey's girlfriend. We are not permitted to second-guess the jurors' apparent determination that Rhonda was

---

[13] Cassandra stayed in Rhonda's room while the hospital had in effect a safety plan requiring "[Rhonda] to have a sitter in her room at all time and visitors to be monitored." Exhibits Vol. I p. 92.

less than truthful in her testimony. *See Gibson*, 51 N.E.3d at 210. Sufficient evidence supports Ramsey's conviction for intimidation.

## Conclusion

[39] The trial court properly admitted Rhonda's statements pursuant to the medical records and excited utterance exceptions to the rule against hearsay. The evidence is sufficient to support Ramsey's conviction for intimidation as a Level 6 felony. We affirm.

[40] Affirmed.

Baker, J., and May, J., concur.