

# IN THE

# Indiana Supreme Court



FILED

Feb 24 2026, 11:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Supreme Court Case No. 23S-LW-139

## Michael Carr,

*Appellant (Defendant below),*

—v—

## State of Indiana,

*Appellee (Plaintiff below).*

---

Argued: October 9, 2025 | Decided: February 24, 2026

Direct appeal from the Wayne Superior Court
No. 89D02-1808-MR-3
The Honorable Gregory A. Horn, Judge

---

**Opinion by Justice Goff**

Chief Justice Rush and Justices Massa, Slaughter, and Molter concur.

**Goff, Justice.**

While on parole from a previous conviction for dealing cocaine, Michael Carr shot and killed the confidential informant that helped convict him. A jury found Carr guilty of murder and recommended a life-without-parole (LWOP) sentence, which the trial court imposed. Carr appeals, arguing that his constitutional right to an impartial jury was violated, the trial court erred in admitting certain evidence, the trial court erred in its final jury instructions, and his sentence is inappropriate. Finding no constitutional violation, no procedural error, and no inappropriate sentence, we affirm.

# Facts and Procedural History

On August 2, 2018, at around 1:48 a.m., Michael Carr shot and killed Jason Lewis in Richmond, Indiana. Lewis, acting as a confidential informant, had previously purchased drugs from Carr. Carr and Lewis were childhood friends. Based on the controlled buy, Carr was convicted of dealing in cocaine in 2013 and sentenced to eight years in the Department of Correction. Carr was released on parole on May 3, 2018.

While still on parole, Carr worked with Lamita Vansickle to lure Lewis to the Country Club Apartments where he killed him.[1] Vansickle and Lewis exchanged messages on Facebook arranging to meet and have sex. Vansickle picked Lewis up in her car and drove him to the apartments. They got out of the car and started walking when Carr, wearing a red shirt and a face covering, emerged from behind a bush and shot at Lewis twice. Vansickle ran back to her car and drove away.

After being shot, Lewis ran into one of the apartment buildings and Carr chased after him. Lewis ran up to the third floor and banged on an apartment door. The resident opened the door, and Lewis ran in, holding

---

[1] Vansickle pled guilty to Level 1 felony conspiracy to commit murder. *See* Ind. Code § 35-41-5-2; I.C. § 35-42-1-1. She was sentenced to thirty years in the Department of Correction with two years suspended. Cause No. 89D02-1906-MR-2.

his side and saying he got shot. Once Lewis was in, the resident turned around to get help when Carr entered the apartment. At that point, Lewis jumped out the window and Carr exited the apartment. Carr continued to chase Lewis, eventually catching up and shooting him again. Carr then "stood over top" of Lewis and "unloaded … the whole magazine into him." Tr. Vol. 3, p. 241. Carr fired eighteen shots in quick succession, fifteen of which struck and killed Lewis. Carr ran back to his car where A.J. Smith was waiting, and Carr drove them off. About twelve minutes after the murder, Smith was dropped off at home and was "freaking out" when he woke up his sister, Christina, and told her that Carr shot Lewis. Tr. Vol. 4, pp. 55–56.

Two days after the murder, Carr went to Vansickle's place of employment and threatened to kill her and her kids if she said anything about the murder. Carr also sent his girlfriend at the time, Jannae Cole, a letter instructing her to tell Vansickle and Smith that he would harm them and their children if they testified against him. She communicated the threat to Vansickle's husband and Smith. In addition, Carr posted on Facebook urging Vansickle to "free [him]" because he's "trynna enjoy the summer." Ex. Vol. 1, p. 34. Carr also offered Brandon Coe, who Carr had previously been in jail with, $10,000 to kill Vansickle. Further, Carr admitted to people that he shot Lewis, and he wrote letters describing the crime.

The State charged Carr with murder and requested an LWOP sentence, alleging the aggravating circumstances of lying in wait and being on parole at the time of the murder. *See* Ind. Code §§ 35-50-2-9(b)(3), (b)(9)(D). A jury trial began on April 24, 2023.

During jury selection, the court summoned 120 people for the venire panel, of which sixteen were dismissed without appearing, leaving 104 potential jurors. Only three minority individuals appeared, of which only one was African American. Carr—who is African American—objected, arguing that the venire derived from an unfair cross-section of the community. Then all the minority individuals were excused, resulting in an all-white jury. Carr renewed his objection, asking to draw a new

venire, and the trial court denied the request after finding that the jury had been randomly selected.

After the jury was empaneled, the trial court recited a preliminary article 1, section 19 instruction which read, "Under the Constitution of the State of Indiana, you as jurors have the right to determine both the law and the facts. The [trial court's] instructions are your best source in determining the law applicable to this case." Tr. Vol. 3, p. 192. The trial court omitted the article 1, section 19 instruction in its final instructions, but Carr neither objected to its omission nor tendered his own instruction. The jury had copies of both the preliminary and final instructions in the jury room and was advised by the trial court "to consider all of the instructions, both preliminary and final, together." Tr. Vol. 7, p. 45.

During trial, Vansickle and Smith could not be located. Police knew Vansickle was a witness in this case, there was a warrant out for her arrest, all police units were on alert looking for her, and the U.S. Marshals Service sought four search warrants in attempts to track her cell phone. Police also attempted to serve Smith with a subpoena on multiple occasions but were unsuccessful. The State argued that Carr forfeited his right to confront Vansickle and Smith by wrongdoing after he threatened them. In lieu of testimony, the State sought to admit statements Vansickle and Smith previously made to police. Vansickle told police that she recognized the shooter as Carr from his face tattoo. Smith told police Carr drove him to the Country Club Apartments, and he heard gunshots but did not see what happened. The trial court admitted the statements over Carr's objection. The trial court also allowed Christina (Smith's sister) to testify about Smith's statement that Carr shot Lewis as an excited utterance.

After a ten-day trial, the jury found Carr guilty of murder. The trial court followed the jury's recommendation to sentence Carr to LWOP. Carr now appeals. This Court has mandatory and exclusive jurisdiction in criminal appeals where the trial court sentenced the defendant to either death or LWOP. Ind. Appellate Rule 4(A)(1)(a).

## Standards of Review

This case implicates several standards of appellate review. A de novo standard applies to federal constitutional issues, such as the Sixth Amendment right to an impartial jury. *See Alford v. State*, 699 N.E.2d 247, 251 (Ind. 1998). Although an abuse-of-discretion standard typically applies to a trial court's ruling on the admission of evidence, we engage in de novo review when an alleged "constitutional violation has resulted from the admission of evidence." *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013). Whether a witness is unavailable for purposes of the Confrontation Clause of the Sixth Amendment is a question of law subject to de novo review. *See Fowler v. State*, 829 N.E.2d 459, 465–66 (Ind. 2005).[2] And this Court reviews a trial court's jury instructions for an abuse of discretion. *Dunn v. State*, 230 N.E.3d 910, 914 (Ind. 2024). Finally, the "considerable deference" a trial court enjoys in its sentencing discretion will prevail on appeal "unless overcome by compelling evidence portraying in a positive light the nature of the offense and the defendant's character." *Lane v. State*, 232 N.E.3d 119, 122 (Ind. 2024) (internal quotation marks and citations omitted).

## Discussion and Decision

In resolving this case, our opinion first addresses whether Carr's Sixth Amendment right to be tried by a fair cross-section of the community was violated. We conclude that it was not because Carr has not shown that African Americans were systematically excluded from jury service in Wayne County. *See infra* Section I. Next, Carr argues that the trial court

---

[2] Here, the parties agree that forfeiture by wrongdoing is a constitutional issue reviewed de novo. In the future, we welcome argument on the standard of review and whether a trial court's factual findings in a forfeiture hearing (like whether the wrongdoing caused the witness's unavailability) should be reviewed for clear error. *See United States v. Carson*, 455 F.3d 336, 362 (D.C. Cir. 2006) ("We review the court's legal conclusions regarding the Confrontation Clause and Rule 804(b)(6) de novo and its *factual findings for clear error.*") (internal citations omitted) (emphasis added).

erred in admitting statements made by Vansickle and Smith. We conclude that the trial court did not abuse its discretion by admitting Vansickle and Smith's statements to police because he forfeited his right to confront them when he threatened to kill them and their families. *See infra* Section II.A. The trial court also did not abuse its discretion in admitting Smith's statement to his sister as an excited utterance because Smith was under the stress of a startling event when he made the statement. *See infra* Section II.B. We then address whether the trial court's failure to provide a final instruction on article 1, section 19 of the Indiana Constitution amounted to fundamental error. We hold that it did not because the jury was instructed on article 1, section 19 in the preliminary instructions, and the jury was instructed to consider both the preliminary and final instructions together when making its decision. *See infra* Section III. Finally, we address whether Carr's LWOP sentence should be revised under Appellate Rule 7(B). We hold that it should not when considering the nature of the offense and Carr's character. Carr was on parole when he killed Lewis, and he killed Lewis to get revenge after Lewis testified against him in a previous case. *See infra* Section IV.

## I.  Carr was not denied his Sixth Amendment right to be tried by a fair cross-section of the community.

The Sixth Amendment right to a jury trial requires that the jury is selected from a representative cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). To establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement when a group is excluded from the jury, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community," "(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and "(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Here, of the 120 persons called for the venire panel, sixteen were dismissed without appearing, leaving 104 potential jurors, only three of which, according to defense counsel, looked to be

"possible minorities." Tr. Vol. 2, p. 241. And only one of those three potential jurors appeared to be African American. *Id.* African Americans are a distinctive group in the community to which *Duren* applies. *Fields v. State*, 679 N.E.2d 1315, 1318 (Ind. 1997). But Carr fails to show that any underrepresentation is due to a "systematic exclusion" of African Americans in the jury-selection process.

"To prove systematic exclusion, a defendant must demonstrate that a large discrepancy between the percentage of a certain group in the community and the percentage of that group in jury panels occurs 'not just occasionally,' but on a regular basis." *Williams v. State*, 877 N.E.2d 845, 847 (Ind. Ct. App. 2007) (quoting *Duren*, 439 U.S. at 366), *trans. denied*. Moreover, that consistent exclusion must "be traced to the system by which juries are selected." *Id.* (citing *Duren*, 439 U.S. at 367). In *Duren*, the defendant demonstrated systematic exclusion by showing a large discrepancy in every weekly venire for nearly a year. 439 U.S. at 366.

To qualify as an eligible juror in a criminal case in the State of Indiana, a juror must be a citizen of the United States, at least eighteen years of age, a resident of the summoning county, be eligible to vote, meet certain competency requirements, and not be a law-enforcement officer. Ind. Jury Rule 5. Wayne County uses a master jury-pool list which compiles records from the BMV and Department of Revenue to capture ninety-nine percent of potential jurors. The system then selects individual jury venires using a computerized random-selection program. The system has been approved by this Court. Tr. Vol. 2, p. 244. This list "is more inclusive of Indiana's citizens" than previous lists, and "courts have noticed a considerable increase in the diversity of jury pools" since first implemented in 2006. Indiana Office of Judicial Administration, *Statewide Jury Pool Project*, https://www.in.gov/courts/admin/tech/jury-pool (last visited Feb. 19, 2026). Carr suggested at trial that "voter rolls, property owners, public assistance records, and maybe school enrollment might be a way to encompass more of the minority population in the county," but he does not provide evidence to back this claim. *See* Tr. Vol. 3, p. 168. And even if Carr has shown that this system led to an underrepresentation of African Americans in his jury venire, he has not shown how the procedure systemically excludes African Americans from jury venires "on a regular

basis." *See Williams*, 877 N.E.2d at 847. Carr points to the trial court's hypothetical statement that it may take "ten in a row draws" before a "representative group" is selected. Tr. Vol. 2, p. 244. But Carr presents no evidence that this happens in practice.

Carr also argues that to achieve a "fair cross-section" requires race-determinative inquiries to ensure that certain groups are not excluded from the selection process. Appellant's Br. at 20 (emphasis omitted). Indiana is one of thirty states that does not collect juror race and ethnicity data, and the jury questionnaires in Carr's case did not ask about race. *Id.* at 21. Carr argues that failure to collect this data is a failure to mitigate underrepresentation, and that is a form of systematic exclusion. *Id.* But not asking jurors their race on the jury questionnaire after selection isn't the same as excluding minorities from being selected to sit on the jury in the first place.[3]

Because Carr only presents his venire and does not show underrepresentation on a regular basis, Carr did not prove African Americans are systematically excluded from jury selection.

## II. The trial court did not abuse its discretion in admitting certain out-of-court statements made by Vansickle and Smith.

The trial court admitted statements Vansickle and Smith made to police describing the crime. We consider these statements admissible under Evidence Rule 804(b)(5) because Carr forfeited his right to confront the

---

[3] We acknowledge Carr's point that *Duren* places a very high burden on defendants. It is difficult for defendants to access and collect jury-selection information, and, unlike other race-based challenges such as *Batson*, *Duren* does not shift the burden to the State to establish neutrality. *See Bond v. State*, 925 N.E.2d 773, 777–78 (Ind. Ct. App. 2010), *trans. denied*. Carr argues it might be worth "easing the *Duren* burden for Hoosiers." Appellant's Br. at 20 (quoting *Bond*, 925 N.E.2d at 778). But *Duren* is United States Supreme Court precedent on the Sixth Amendment which we cannot "ease." Defendants may be afforded more protection under the Indiana Constitution, but Carr didn't argue such a claim. In any case, his concerns on jury-data collection may be better addressed through policy reform.

witnesses after he threatened to kill them and their families. The trial court also admitted Smith's statement to his sister that Carr had shot Lewis. We find no abuse of discretion in the admission of this statement under the excited-utterance exception to the rule against hearsay.

## A. Vansickle and Smith's statements to police were admissible because Carr forfeited his confrontation rights by wrongdoing.

The Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. Under this right, a witness's out-of-court testimonial statements may be admitted at trial only if (1) the declarant is unavailable to testify and (2) the defendant has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). But a defendant can forfeit his right to confront a witness when his own wrongdoing causes the witness to be unavailable to testify at trial. *Scott v. State*, 139 N.E.3d 1148, 1153 (Ind. Ct. App. 2020), *trans. denied*. The forfeiture-by-wrongdoing doctrine is also enshrined in our rules of evidence. Indiana Evidence Rule 804(b)(5) provides that a "statement offered against a party that has engaged in or encouraged wrongdoing that was *intended to, and did,* procure the *unavailability* of the declarant as a witness for the purpose of preventing the declarant from attending or testifying" is not excluded by the rule against hearsay (out-of-court statements offered for the truth of the matter asserted) (emphases added). This protects the integrity of judicial proceedings. *Davis v. Washington*, 547 U.S. 813, 833 (2006).

Here, Carr argues that Vansickle and Smith's statements to police were inadmissible because he did not have the opportunity to cross-examine them about the statements, and the statements were inadmissible hearsay. *See* Evid. R. 801, 802. We disagree. Vansickle and Smith were unavailable because Carr threatened to kill them and their families, so he forfeited his right to confront them and their statements to police are not excluded by the rule against hearsay.

### 1. Vansickle and Smith were unavailable because they did not appear for trial even after the State made reasonable efforts to procure their attendance.

First, to admit Vansickle and Smith's statements to police, the State had to prove Vansickle and Smith were unavailable. To satisfy the unavailability requirement, the prosecution must have made a "good faith effort" to secure the witness's presence. *Jackson v. State*, 735 N.E.2d 1146, 1151 (Ind. 2000) (citing *Barber v. Page*, 390 U.S. 719, 725 (1968)).[4] Whether the State has satisfied the "good faith effort" requirement is a question of reasonableness, and the "ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated on other grounds by Crawford*, 541 U.S. at 60; *see also* Evid. R. 804(a)(5). Here, the State made reasonable efforts to obtain Vansickle and Smith's presence. Police knew Vansickle was a witness in this case and had a warrant out for her arrest. All local police units were on alert to look for her. The U.S. Marshals Service also sought search warrants to locate her phone to try to find her. As for Smith, police attempted to serve him with a subpoena on multiple occasions. *See Berkman v. State*, 976 N.E.2d 68, 77 (Ind. Ct. App. 2012) (holding that a witness was "unavailable" for purposes of admitting deposition testimony where the State subpoenaed the witness and the witness was avoiding an arrest warrant), *trans. denied*. Because the State made reasonable efforts to procure Vansickle and Smith's attendance at trial, but they did not appear, they were unavailable.

---

[4] The State suggests that it need not prove it made a good-faith effort to obtain Vansickle and Smith's attendance at trial in a forfeiture-by-wrongdoing case. *See* Appellee's Br. at 23 n.8. But if the State never tries to obtain testimony, then the court doesn't know if the witness failed to appear because of the State's lack of effort or because wrongdoing by the defendant contributed to their unavailability.

## 2. Carr forfeited his right to confront Vansickle and Smith by threatening to kill them and their families.

The trial court did not err in concluding that Carr forfeited his right to confrontation when he threatened to kill the potential witnesses and their families if they testified against him, especially after he already killed the witness from his prior case.

"[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right of confrontation." *Davis*, 547 U.S. at 833. "The doctrine is only applicable where, in undertaking the actions that rendered the witness unavailable, the defendant had in mind the particular purpose of making that witness unavailable." *Doyle v. State*, 223 N.E.3d 1113, 1121 (Ind. Ct. App. 2023). We may "infer a defendant's intent to silence a witness from a defendant's conduct and the natural consequences thereof." *Id.* (internal quotation marks and citation omitted). "The timing of a defendant's actions is probative of his or her intent on the issue." *Id.* at 1122. "The issue is not the severity of [the party's] conduct; it is whether [the party] engaged in conduct that was designed to procure [the declarant's] absence and whether that conduct was of such significance that [the declarant] has been 'kept back' from attending depositions or trial." *Scott*, 139 N.E.3d at 1155. The State bears the burden of showing by a preponderance of the evidence that the defendant forfeited his right to confrontation. *Davis*, 547 U.S. at 833.

Here, Detective Thomas Legear testified at the forfeiture-by-wrongdoing hearing that he interviewed Vansickle a few weeks after Lewis's murder. According to his testimony, Carr approached Vansickle about two days after the murder and said, "If you say anything I will kill you and your kids." Tr. Vol. 2, p. 41. Vansickle told Detective Legear that she was frightened from the threat. Sometime thereafter, Carr posted on his Facebook page urging Vansickle to "free [him]." Ex. Vol. 1, p. 34. Carr also sent a letter to his girlfriend at the time, Jannae Cole, instructing her to tell Vansickle and Smith that he would kill them and their children if they testified against him. Cole communicated the threat to Vansickle's husband and Smith. By threatening to kill Vansickle, Smith, and their families, Carr engaged in wrongdoing to prevent their testimony. *See*

*Smoots v. State*, 172 N.E.3d 1279, 1287 (Ind. Ct. App. 2021) (holding that the defendant forfeited his confrontation rights after he instructed two people to make death threats to a witness if he testified against the defendant).

Carr argues that his threats did not procure Vansickle's unavailability because Carr threatened Vansickle five years before trial, and there's no evidence that Vansickle knew Carr offered to pay Coe to kill her or that Vansickle's husband communicated Cole's threat to her. Appellant's Br. at 29. Carr also argues Vansickle failed to appear because she was trying to avoid her own criminal case. *Id.* at 34. The State charged Vansickle with aiding, inducing, or causing Lewis's murder. Vansickle appeared at hearings and conferences for three-and-a-half years but then failed to appear at a status hearing in December 2022. She was a fugitive for five months before being apprehended about two weeks after the jury returned a guilty verdict in Carr's case. So, her unavailability could have been caused by her avoiding her own trial. Nevertheless, Carr's threats were still a significant factor holding Vansickle back from testifying. Carr went to Vansickle's place of employment to threaten her and posted on his Facebook page urging Vansickle to "free [him]." Ex. Vol. 1, p. 34. Although these threats were made years before trial, Vansickle knew Carr had killed Lewis for being a witness against him in a previous case, so Carr's threats were very serious and Vansickle feared she would also be killed if she testified. And the fact that Vansickle was apprehended shortly after Carr's trial suggests that she was unavailable to avoid testifying in Carr's case rather than to avoid her own trial.

As to Smith, Carr had his then-girlfriend Jannae Cole tell Smith that he and his children would be harmed if he testified against Carr at trial. Cole testified that she communicated that threat to Smith. Because the threats to Smith and his family were communicated to Smith, and because Carr had just killed Lewis for being a witness in his drug case, we can infer that the threats likely caused Smith to be absent at trial.

Because Vansickle and Smith were unavailable for trial, and because their unavailability was caused by Carr's threats, Carr forfeited his right to

confront them, and Vansickle and Smith's statements to police are not excluded by the rule against hearsay. *See* Evid. R. 804(b)(5).[5]

### 3. Even if Carr did not forfeit his confrontation rights, any error was harmless beyond a reasonable doubt.

Even if admission of Vansickle and Smith's statements to police violated Carr's confrontation rights, the error was harmless beyond a reasonable doubt. Violations of the Confrontation Clause require reversal unless "the State can show beyond a reasonable doubt that the error did not contribute to the verdict." *Koenig v. State*, 933 N.E.2d 1271, 1273 (Ind. 2010). To determine whether the State met its burden, we consider several factors such as the significance to the State's case of the allegedly improperly admitted evidence, whether that evidence was "merely cumulative," and "whether it was corroborated or contradicted by other evidence." *Taylor v. State*, 271 N.E.3d 559, 563 (Ind. 2025) (citing *Koenig*, 933 N.E.2d at 1273).

Here, there was significant evidence to support Carr's murder conviction and LWOP sentence besides Vansickle and Smith's statements to police. At the jury trial, Jannae Cole testified that Carr had told her that he shot Lewis because he was a confidential informant in his drug case. He also admitted to Coe in a recorded phone call that he shot Lewis. And,

---

[5] Citing federal precedent, Carr argues that after a finding that a defendant waived his confrontation rights and objection of hearsay evidence, the trial court "must still perform the balancing test required" under Evidence Rule 403. Appellant's Br. at 26 (quoting *United States v. Dhinsa*, 243 F.3d 635, 655 (2d. Cir. 2001)). But Carr waived the issue by failing to raise it at trial. Even if the trial court were required to perform the balancing test, the error was harmless because the evidence was admissible under Indiana Evidence Rule 403. Under that rule, the trial court may exclude relevant evidence if its "probative value is substantially outweighed" by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Here, the evidence was highly probative because it identified Carr as the shooter and any prejudice was not "unfair" to Carr. *See Ind. State Police v. Est. of Damore*, 194 N.E.3d 1147, 1160 (Ind. Ct. App. 2022) ("Unfair prejudice looks to the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper basis.") (internal quotations marks, brackets, and citation omitted), *trans. denied*.

significantly, Carr wrote letters describing the crime in detail.[6] In these letters, he explains how he was "at the location where Jason Lewis got shot and his life taken all for doing some rat shit behind [Carr's] back." Tr. Vol. 7, p. 32. He also says in the letters, "A couple of shot[s] went through his body and I had to chase him. I caught his ass, drawed down on him then erased him. Twelve was on the scene and found eighteen shell casings." *Id.* And finally, Carr says, "I'm holding court in the streets," so "if you ever cross me, the end result is a homicide." *Id.* at 32–33. From these clear admissions of guilt, along with his motive for murdering Lewis, any violation of Carr's confrontation rights was harmless beyond a reasonable doubt. *See Jefferson v. State*, 399 N.E.2d 816, 819–20 (Ind. Ct. App. 1980) (holding that any violation of the defendant's confrontation rights was harmless beyond a reasonable doubt where the defendant's confession was lawfully introduced).

## B. Smith's statement to his sister was admissible as an excited utterance.

At trial, Smith's sister, Christina, testified over objection that Smith identified Carr as the person who shot Lewis. Christina testified that, at about 2:00 a.m., Smith woke her up, was "freaking out," and told her that Carr shot Lewis. Tr. Vol. 4, p. 55. The shooting had occurred at 1:48 a.m. *Id.* Carr argues that the trial court erred in admitting the statement under the excited-utterance exception to the rule against hearsay.[7] Appellant's Br. at 36–37.

Under Indiana Evidence Rule 803(2), the trial court can admit an "[e]xcited utterance," *i.e.*, a "statement related to a startling event or condition, made while the declarant was under the stress of excitement that

---

[6] The State presented testimony from a handwriting expert and Jannae Cole to identify Carr's handwriting. *See* Evid. R. 901.

[7] At trial, the State argued that Smith's statement to Christina was also admissible as a statement of identification, but the State abandoned that claim at oral argument before this Court. Tr. Vol. 4, p. 48; Evid. R. 801(d)(1)(C); Oral Argument at 25:06–25:21.

it caused." To determine whether a statement is an excited utterance, we consider "whether the declarant was still under the stress of excitement caused by the startling event when the statement was made." *Noojin v. State*, 730 N.E.2d 672, 676 (Ind. 2000) (quoting *Yamobi v. State*, 672 N.E.2d 1344, 1346 (Ind. 1996)). We consider the circumstances, including the declarant's physical and emotional condition, the nature of the startling event, whether the declarant had the opportunity to cool down, and whether the statement was made spontaneously. *Young v. State*, 980 N.E.2d 412, 421 (Ind. Ct. App. 2012); *Fowler*, 829 N.E.2d at 463. The logic behind admitting excited utterances is that the startling event and absence of opportunity for cool reflection make statements more reliable and reduce the likelihood of fabrication. *Ramsey v. State*, 122 N.E.3d 1023, 1032 (Ind. Ct. App. 2019) (citing 13 Robert Lowell Miller, Jr., *Indiana Practice: Indiana Evidence* § 803.102 at 307–09 (4th ed. 2018)), *trans. denied*. An excited utterance is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness. Evid. R. 803(2).

Here, the trial court did not abuse its discretion in admitting Smith's statement to Christina as an excited utterance. Although Smith made the statement twelve minutes after the shooting and after being dropped off at his and Christina's home, the circumstances suggest that Smith spoke under the stress of a startling event without time for cool reflection. Smith experienced a startling event: being implicated in a murder. He then woke up Christina, was "freaking out" from having been implicated in a murder, spontaneously told her that Carr shot Lewis, and had little reason to fabricate the story to his sister. *See Noojin*, 730 N.E.2d at 676 (holding that the trial court did not abuse its discretion in admitting a declarant's statement that she saw the defendant in the victims' home as an excited utterance where she made the statement twenty-five minutes after finding the victims' bodies but was "nervous, crying, and visibly shaken"); *Williams v. State*, 546 N.E.2d 1198, 1199 (Ind. 1989) (holding that the trial court did not abuse its discretion in admitting a three-year-old child's statement that her "daddy shot" her mother as an excited utterance because she was still under the

stress of the startling event and was unlikely to fabricate her statement, even "several minutes" after the shooting).[8]

Even if the trial court erred in admitting Smith's statement to his sister, the error was harmless. When reviewing an alleged error that is not of constitutional dimension, the error is harmless if its "probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." App. R. 66(A). "Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined." *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023).

As discussed above, the State provided significant evidence of Carr's guilt, including testimony from Jannae Cole that Carr had admitted to killing Lewis, Carr's letters admitting to the crime, and Carr's motive to get revenge for Lewis having ratted on him in Carr's drug-dealing case. This leaves us confident that admission of Smith's statement to Christina did not undermine the outcome in this case. *See Hester v. State*, 551 N.E.2d 1187, 1192 (Ind. Ct. App. 1990) (holding that erroneously admitted evidence is harmless when properly admitted evidence supporting the guilty verdict is "overwhelming").

---

[8] Carr raises for the first time in his appellant's brief that Smith's statement is inadmissible because he did not have personal knowledge that Carr was the shooter. Appellant's Br. at 36–37; *see Noojin*, 730 N.E.3d at 677 (holding that the declarant's statement that the defendant killed the victims was not admissible as an excited utterance because it was based on conjecture and the excited-utterance exception assumes the statement was "based on the declarant's personal knowledge"); *see also* Evid. R. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *see also* Evid. R. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."). Because the issue was not raised at trial, it is waived. Still, Smith's statement that Carr was the shooter was based on the fact that he rode with Carr to the apartment, waited while Carr went to get money from someone, heard gunshots, and was told by Carr that a "dude tried some slick shit." Ex. Vol. 1, p. 111. Although he didn't see the shooting, Smith's statements were based on his personal observations rather than pure conjecture.

## III. The trial court's instructional error was not fundamental.

Article 1, section 19 of the Indiana Constitution provides that "[i]n all criminal cases whatever, the jury shall have the right to determine the law and the facts." Here, the trial court tendered a preliminary instruction on section 19 but failed to give such an instruction during final jury instructions. Such failure may amount to reversible error. *See Warren v. State*, 725 N.E.2d 828, 836–37 (Ind. 2000) (reversing a habitual-offender determination following a two-day jury trial where the trial court omitted a proper section 19 final instruction, despite the defendant's request and despite having provided such an instruction two days prior). But unlike the defendant in *Warren* who tendered a section 19 final instruction, Carr neither objected to its omission nor tendered his own section 19 instruction, thus waiving the issue for appellate review. *See Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018). Therefore, Carr argues that the omission of a final section 19 instruction amounts to fundamental error, an exception to waiver. We disagree.

An error is fundamental error when the error "made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Id.* at 652 (quoting *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014)). This Court has previously held that there was no fundamental error when a trial court failed to explicitly inform the jury during the habitual-offender stage of trial that it was the judge of the law and facts when the jury was given similar instructions on more than one occasion during the first phase of the trial. *Clark v. State*, 561 N.E.2d 759, 764 (Ind. 1990). This was because "both preliminary and final instructions are not to be considered in isolation but as a whole and with reference to each other." *Bonham v. State*, 644 N.E.2d 1223, 1227 (Ind. 1994).

Under these facts, the trial court's failure to give a final section 19 instruction did not amount to fundamental error. Although the jury was not instructed on section 19 in the final instructions, the jury was still instructed during the preliminary instructions that it had the "right to determine both the law and the facts." Tr. Vol. 3, p. 192. It was then

instructed in final instructions that it will have copies of the preliminary and final instructions in the jury room and "to consider all of the instructions, both preliminary and final, together." Tr. Vol. 7, p. 45; *see Clark*, 561 N.E.2d at 764.

Carr argues that the failure to give a final section 19 instruction amounts to fundamental error because of the severity of his sentence and length of his trial. Appellant's Br. at 40. Carr faces life without the possibility of parole, which many regard as "equally severe" as the death penalty. *See Wright v. State*, 168 N.E.3d 244, 261 n.11 (Ind. 2021) (quoting *Smith v. State*, 686 N.E.2d 1264, 1273 (Ind. 1997)). His trial was also lengthy, lasting ten days and taking twelve days to complete with the intervening weekend. Considering the length of time between the preliminary and final instructions, Carr argues the failure to provide a final instruction on article 1, section 19 was fundamental error. But the trial court instructed the jury in its final instructions to consider the preliminary and final instructions together, the jury had copies of the instructions, and the preliminary instructions included the section 19 instruction. We will presume the jury followed that instruction and considered section 19 when deliberating. *See Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) ("When the jury is properly instructed, we will presume they followed such instructions.") (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987)). Therefore, the trial court's failure to give a final section 19 instruction here did not deny Carr fundamental due process.[9]

## IV.  Carr's LWOP sentence is not inappropriate.

Finally, Carr argues his LWOP sentence is inappropriate and asks us to revise it to an aggregate term of years under Appellate Rule 7(B). We decline to do so.

---

[9] In his appellant's brief, Carr argued that the failure to provide a final section 19 instruction amounted to structural error, but he withdrew this argument in his reply brief. Appellant's Reply Br. at 16 n.12.

Under article 7, section 4 of the Indiana Constitution, we have the power to "review and revise the sentenced imposed" in appeals of criminal cases. Through Appellate Rule 7(B), appellate courts can "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). The purpose of Appellate Rule 7(B) is "to leaven the outliers, rather than to achieve a perceived 'correct' sentence." *Cramer v. State*, 240 N.E.3d 693, 698 (Ind. 2024) (quoting *McCallister v. State*, 91 N.E.3d 554, 566 (Ind. 2018)). "The trial court's sentence is afforded considerable deference and will stand unless 'compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character).'" *Id.* (quoting *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015)).

As to the nature of the offense, the murder here was brutal and calculated. Carr waited years to exact revenge on Lewis for his role as a confidential informant in Carr's drug-dealing case. With the help of Vansickle, Carr lured Lewis to the apartment complex. After only wounding Lewis with the first shots, Carr chased Lewis through the apartment building, resulting in a wounded Lewis jumping out a three-story window. When Carr reached Lewis, he shot at him eighteen times in a matter of seconds. *See Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015) (concluding that the brutal nature of the defendant's crimes did not warrant reducing his LWOP sentence after he shot his mother multiple times and set the house on fire). In addition, the fact that Carr was on parole and committed this murder to exact revenge for his previous conviction creates concern that he may seek revenge against other witnesses if he's released on parole again. In fact, he threatened to kill Vansickle and Smith and their families if they testified in this case.

As to his character, Carr argues he had a difficult childhood because was "born into a toilet," his mother was addicted to drugs, his father was intermittently incarcerated, he did not have a stable home life, and he did not finish high school. Appellant's Br. at 49–50. But "this Court has consistently held that evidence of a difficult childhood warrants little, if

any, mitigating weight." *Ritchie v. State*, 875 N.E.2d 706, 725 (Ind. 2007) (citing *Coleman v. State*, 741 N.E.2d 697, 703 (Ind. 2000)). Next, Carr's delinquent behavior began at age fifteen, including shoplifting, possession of cocaine, and truancy. Carr's adult criminal history includes two misdemeanors and three felonies between the ages of twenty and twenty-two. Carr characterizes these acts as "relatively minor and non-violent." Appellant's Br. at 50. Still, Carr's delinquent and criminal history weigh against his character when assessing his 7(B) claim. *See Prince v. State*, 148 N.E.3d 1171, 1174 (Ind. Ct. App. 2020) ("Even a minor criminal history is a poor reflection of a defendant's character.").

By "holding court in the streets" and seeking revenge against Lewis after he testified in Carr's last trial, Carr has shown blatant disregard for the rule of law. *See* Tr. Vol. 7, p. 33. For these reasons, we decline to revise Carr's LWOP sentence to a term of years under Appellate Rule 7(B).

## Conclusion

Finding no violation of Carr's constitutional rights, no error in the admission of evidence, no error in the jury instructions, and no error in Carr's sentence, we affirm Carr's conviction for murder and his LWOP sentence.

Rush, C.J., and Massa, Slaughter, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT
Michael C. Cunningham
Baldwin, Perry & Wiley, P.C.
Franklin, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana